# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 11, 2001 Session

## STATE OF TENNESSEE v. RONALD EUGENE RICKMAN AND WILLIAM EDWARD GROSECLOSE

**Direct Appeal from the Criminal Court for Shelby County**
**No. B-59341      James C. Beasley, Jr., Judge**

---

**No. W1999-01744-CCA-R3-CD  - Filed May 17, 2002**

---

The appellants, Ronald Eugene Rickman and William Edward Groseclose, appeal their convictions by a jury in the Shelby County Criminal Court of, respectively, first degree murder and being an accessory before the fact to first degree murder.  In this appeal, appellant Groseclose presents the following issues for our consideration: (1) whether the trial court erred in failing to sever his trial from that of co-defendant Rickman; (2) whether the trial court erred in admitting at trial the former testimony of Barton Wayne Mount; (3) whether the trial court erred in excluding testimony by Gary King; and (4) whether the evidence adduced at trial is sufficient to support the jury's verdict of guilt.  Appellant Rickman solely challenges the introduction at trial of Mount's former testimony.  Following a careful review of the record and the parties' briefs, we remand this case to the trial court for correction of the judgments to reflect the appellants' receipt of credit for time served in the Tennessee Department of Correction prior to trial.  We affirm the judgments in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Remanded for Correction and otherwise Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Joseph S. Ozment (at trial and on appeal) and Steffen Schreiner (at trial), Memphis, Tennessee, for the appellant, Ronald Eugene Rickman.

Gerald Skahan (at trial and on appeal) and Paula Skahan (at trial), Memphis, Tennessee, for the appellant, William Edward Groseclose.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Edgar A. Peterson, IV, and J. Robert Carter, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Procedural Background**

On September 30, 1977, a Shelby County Grand Jury indicted appellants Groseclose and Rickman and co-defendants Barton Wayne Mount and Phillip Michael Britt for one count of first degree murder and further indicted Groseclose and Mount for one count of being accessories before the fact to first degree murder. The two-count indictment arose from the infamous murder-for-hire of Groseclose's wife, Deborah Lee Groseclose, in Memphis, Tennessee on June 29, 1977. Between February 18 and March 3, 1978, Groseclose, Rickman, and Britt were tried jointly by a jury in bifurcated proceedings in which the State ultimately sought the death penalty. State v. Groseclose, 615 S.W.2d 142, 144 (Tenn. 1981). The guilt/innocence phase of the trial resulted in the defendants' convictions of first degree murder. Id. At the conclusion of the sentencing phase, the jury imposed sentences of death upon Groseclose and Rickman and granted Britt a sentence of life imprisonment in the Tennessee Department of Correction. Id. Subsequently, on November 27, 1978, co-defendant Mount pled guilty to second degree murder in return for a sentence of ten years incarceration in the Tennessee Department of Correction. Rickman v. Dutton, 864 F. Supp. 686, 696 (M. D. Tenn. 1994).

Following their convictions of first degree murder and the imposition of sentences of death, Groseclose and Rickman embarked upon a lengthy series of appeals and collateral proceedings culminating in the reversals of their convictions and sentences by the United States District Court for the Middle District of Tennessee, see Groseclose v. Bell, 895 F. Supp. 935 (M. D. Tenn. 1995); Rickman, 864 F. Supp. at 686; Rickman v. Dutton, 854 F. Supp. 1305 (M. D. Tenn. 1994), which reversals were affirmed by the United States Court of Appeals for the Sixth Circuit, Groseclose v. Bell, 130 F.3d 1161 (6th Cir. 1997), cert. denied, 523 U.S. 1132, 118 S. Ct. 1826 (1998); Rickman v. Bell, 131 F.3d 1150 (6th Cir. 1997), cert. denied, 523 U.S. 1133, 118 S. Ct. 1827 (1998). Specifically, the Sixth Circuit appellate court approved the district court's conclusion that both Groseclose and Rickman had received ineffective assistance of counsel amounting to a violation of the Sixth and Fourteenth Amendments to the United States Constitution. Groseclose, 130 F.3d at 1162; Rickman, 131 F.3d at 1156. The United States Supreme Court denied the State's petition for writ of certiorari on May 18, 1998.

Approximately eight months later, Groseclose and Rickman were once again tried jointly by a jury in bifurcated proceedings in which the State sought their convictions and the imposition of sentences of death pursuant to the 1977 indictment. A jury was impaneled and sworn and the guilt/innocence phase of the trial commenced on February 1, 1999, resulting on February 12 in Rickman's conviction of first degree murder and Groseclose's conviction of being an accessory before the fact to first degree murder. Following the sentencing phase of the trial, however, the jury declined to sentence the appellants to death, instead granting them terms of life imprisonment in the Tennessee Department of Correction.

**II. Factual Background**

At the time of Deborah Groseclose's murder in the summer of 1977, she and Groseclose had been married for approximately two or three years and resided in the Frayser neighborhood of Memphis. Deborah was twenty-four years old and employed as a receptionist in a medical clinic. Groseclose was twenty-nine years old and employed as a recruiter for the United States Navy. The Grosecloses had one son named Nathan who was almost one year old. Additionally, Deborah had a six-year-old daughter from a prior marriage named Tonya Foley, who was visiting her father in Mississippi. The Grosecloses had been experiencing marital difficulties punctuated by brief separations. Accordingly, Deborah had sought marriage counseling and, indeed, met with her marriage counselor on the evening of Tuesday, June 28, 1977, the day before her murder. At the appellants' trial, the State successfully posited to the jury that the Grosecloses' marital difficulties in addition to appellant Groseclose's status as the beneficiary of several insurance policies on Deborah's life motivated him to hire appellant Rickman and Phillip Michael Britt to murder his wife.

In support of its theory, the State presented the testimony of Doyle Scroggins that, in 1975, he was employed by the Howard Vaughn Agency in Memphis and sold the Grosecloses an insurance policy on Deborah's life amounting to $12,788 and naming Groseclose as the beneficiary. The State also presented the testimony of James W. Perkins that, in 1975, he was an employee of State Farm Insurance and sold to the Grosecloses an insurance policy on Groseclose's life amounting to $30,000 and naming Deborah as the beneficiary. Notably, a $20,000 "rider" on Deborah's life was attached to the principal policy and named Groseclose as the beneficiary. Perkins further recalled that, approximately one month prior to Deborah's murder, Groseclose contacted him and asserted that the $30,000 insurance policy on Groseclose's life had been written incorrectly and was in fact intended to insure Deborah's life, resulting in a $50,000 insurance policy on her life. Groseclose asked Perkins to amend the policy accordingly. Perkins, however, informed Groseclose that he could not amend the policy. Perkins explained: "Well, it's a legal, binding contract between an insurance company and the insured. And for something like that to happen, the insured just has to cancel and then repurchase on a different amount for a different person - - different - - for like Mrs. Groseclose." Perkins advised Groseclose against cancelling the current policy, and Groseclose ultimately agreed.

The State also presented a parade of five different witnesses who testified that, prior to Deborah's murder, Groseclose asked them if they would be willing to kill her for a fee or, alternatively, if they knew of anyone willing to do so. For example, John Shanks testified at trial that, in November 1976, Groseclose was both his Navy recruiter and his friend. During a conversation between Shanks and Groseclose at the Navy recruiting station, Groseclose spoke about his wife and remarked to Shanks that "[w]e're arguing, you know, would you like to kill her. There's some insurance money involved in it." Shanks believed at that time that Groseclose was joking. Shanks observed that Groseclose "[w]as the kind of guy who joked around a lot."

Also, Alvin Bevell testified that he first became acquainted with Groseclose in late 1975 or early 1976 when he drove his friend, Jerry Cochran, to the Navy recruiting station. Groseclose later attempted to recruit Bevell into the Navy, but Bevell's application was rejected due

to his poor eyesight.  Subsequently, in July or August 1976, Groseclose telephoned Bevell and chatted with him for a while before mentioning "something about [his wife] becoming a bitch" and inquiring whether Bevell knew of anyone who would be willing to kill her.  Bevell asserted at trial that, at the time of this telephone conversation, he did not believe that Groseclose was seriously contemplating killing his wife.  One month later, however, Groseclose again telephoned and asked whether Bevell knew of anyone who would be willing to kill his wife.  On this occasion, Groseclose sounded intoxicated.

Michael A. Blasco similarly testified that he first became acquainted with Groseclose when the appellant recruited him into the Navy in January 1975.  Blasco remained in the Navy until March 1977, at which time he joined the Naval Reserve.  In May 1977, he was living in Memphis and was enrolled as a student at Bailey Technical School.  At that time, he and a girlfriend visited Groseclose's home.  Because Deborah was sick, Groseclose and his visitors remained in the driveway, where Groseclose showed Blasco a van that the appellant had recently purchased.  During the visit, Groseclose jokingly asked Blasco whether he knew anybody that did "hit work."

Jent F. Sawyer, II, testified that he too became acquainted with Groseclose when, in 1977, he unsuccessfully attempted to enlist in the Navy.  The Navy rejected his application due to a "plate" that had been inserted in his head following a bicycle accident that occurred when he was nine years old.  Additionally, Sawyer had been voluntarily incarcerated in a mental institution for two and one-half or three years.  In any event, Sawyer recounted at trial that, following his physical examination at the Navy recruiting station, Groseclose drove him home.  During the drive, Groseclose described to Sawyer his marital difficulties.  Additionally, Groseclose

> asked me if I knew anyone that would, excuse me, kill his wife, and I said no.  And he asked me if I would find anyone, and I said I would probably not.  And then he asked me if I would do it myself, and I said no.  And that's when I started getting very uncomfortable with the entire subject matter.

Sawyer recalled, "I thought he was joking at first, but as the conversation wore on, it definitely became more and more he was serious that he wanted his wife killed."  According to Sawyer, Groseclose mentioned collecting insurance proceeds in the event of his wife's death.

Finally, Jerry Cochran testified that Groseclose was his Navy recruiter in 1975.  Cochran served in the Navy for two years on active duty and for four years in the Naval Reserve.  He was discharged from active duty in 1977 and, in March or April 1977, visited Groseclose in Memphis.  Cochran recalled, "Bill liked to joke around and tell stories and stuff and what have you, but he just kind of casually asked me if I wanted to kill his wife."  Moreover, approximately one month later, in May or June 1977, Cochran telephoned Groseclose, and, during the ensuing conversation, Groseclose asked Cochran for assistance in locating someone willing to kill Deborah.  Groseclose spoke in a "regular, calm tone of voice."  Nevertheless, at that time, Cochran believed that Groseclose was joking.  Cochran next visited Groseclose's home on the day of Deborah's funeral. During his visit, Cochran spoke with Groseclose privately and expressed his condolences for Deborah's murder.  Although Deborah's murderers had not yet been apprehended, Groseclose

remarked to Cochran, "It's hard to keep a straight face when you know who did it." According to Cochran, Groseclose was smiling.

The State additionally presented the testimony of Anne Marie Adams, a next-door neighbor of the Grosecloses in the summer of 1977. Adams related that Groseclose was surreptitiously recording telephone calls to and from the Groseclose home immediately prior to Deborah's death. In this regard, Adams recalled that Groseclose visited her home in the summer of 1977 and asked if he could borrow a telephonic recording device "that my husband had made up for my father-in-law because his two brothers, we thought, was on drugs; and my father-in-law wanted to use it to see what was going on." Groseclose informed Adams and her husband that he needed the device for his volunteer work as an auxiliary probation officer with the Shelby County Juvenile Court. Adams testified:

> He said that he was going to use it in a juvenile court case, and that he was going to be up in the attic of the juvenile court, and that people - - that as far as other people knew, he was going to be in Kingsport, but he wasn't going to Kingsport, he was going to be in the juvenile court attic.

Upon receiving this explanation, Adams' husband agreed to loan Groseclose the recording device.

Adams further recalled that, after obtaining the recording device, Groseclose was absent from home for three or four days. On several occasions during Groseclose's absence, Adams observed a man whom she later knew as Barton Mount going into the backyard of the Groseclose home. Becoming suspicious, Adams and her husband decided to inform Deborah about the recording device. Moreover, upon speaking with Deborah, they accompanied her to investigate a shed in the Grosecloses' back yard and discovered the recording device inside. Adams' husband "unhooked" the device, apparently from wires that extended from the wall of the shed. The Adamses then took the recording device home and, along with Deborah, listened to one of the tapes found in the device. They overheard a telephone conversation between Deborah's daughter, Tonya, and her grandmother, Aline Watts, in addition to a telephone call to an automated service that reported the time of day.

Adams also related that she encountered the appellant on June 29, 1977, the day on which Deborah was murdered. Adams was standing in her front yard speaking with another neighbor named Betty Rogers. At approximately 10:00 a.m. or 11:00 a.m., Groseclose approached Adams and Rogers. According to Adams, Groseclose was "very visibly shaken. He was crying." Groseclose informed his neighbors that Deborah's office had just called and informed him that she had never arrived at work that morning. Groseclose then inquired if either woman had seen Deborah. He remarked that a stranger had followed Deborah home from work the previous day. Groseclose described the stranger's vehicle as a "light red Chevrolet" with a green and white license plate. Groseclose noted, however, that he had been unable to read the vehicle's license plate number. Adams recalled that, during the conversation, Barton Mount was standing in the Grosecloses' driveway and also appeared to be crying.

Finally, Adams testified that she and her husband attended Deborah's funeral and, afterwards, visited the Groseclose home. When the Adamses arrived, Groseclose was sitting in the living room, and life insurance documents were spread out before him on the coffee table. Groseclose remarked "that he wasn't so much concerned about the killers being caught; that he just wanted to get on with his life and pay his bills."

Deborah's mother, Aline Watts, also testified on behalf of the State at trial. She recounted that, on the morning of Wednesday, June 29, 1977, at approximately 10:00 a.m., she received a telephone call from Groseclose at her Memphis home. According to Watts, Groseclose asked "if [Watts] had heard from Debbie; that her office had called and said that she had not come to work yet and wanted to know if she was taking the day off." Groseclose explained that he had left the house that morning before Deborah in order to collect his paycheck from the Navy recruiting station and had taken his infant son Nathan with him. Groseclose sounded "pretty chipper" and, when Watts suggested that he call the police, replied that alerting the police would be premature because "[Deborah] might have stopped off for breakfast or something." Groseclose only agreed to call the police when Watts threatened to do so herself.

Notwithstanding Groseclose's assurance, Watts called the police. Watts also periodically spoke with Groseclose on the telephone throughout the morning because Nathan had been ill and Watts was concerned about her grandchild. She again noticed that Groseclose was "calm - - chipper." Finally, at approximately 12:00 p.m. or 1:00 p.m., Watts decided to drive to the Groseclose home, pick up Nathan, and take the baby to her own home until they were able to find Deborah.

Watts recalled that, on that Wednesday morning in June, she was afraid "something really bad had happened." Accordingly, she carried an ice pick with her to the Groseclose home in case she needed a weapon. Moreover, upon arriving at the Groseclose home, she immediately searched the back yard, including a shed and a playhouse, for her daughter. She then entered the house through an unlocked, sliding patio door. A young man whom Watts later knew as Barton Mount was standing in the living room, and Groseclose was in the baby's bedroom. Before retrieving Nathan, Watts unsuccessfully searched the home for her daughter. During her search, Watts could hear the washing machine running. She could also hear Groseclose and Mount talking in the kitchen, albeit she could not distinguish their words. Subsequently, she briefly spoke with Groseclose. At this time, Groseclose appeared to be nervous and informed Watts that Deborah had been awake and getting ready for work when he left home that morning with Nathan. According to Groseclose, Deborah had laid out the clothes she intended to wear to work but was not yet dressed. After speaking with Groseclose, Watts also questioned several neighbors.

As she was returning from a neighbor's home, Watts noticed an "older model white station wagon" parked underneath the Grosecloses' carport and a man whom she later knew as Phillip Britt standing on the front porch speaking with Groseclose. Watts ran onto the front porch and briefly and futilely confronted Britt concerning her daughter's disappearance. She then retrieved Nathan and got into her car. Before she left, Groseclose requested his paycheck, which he had left

in Nathan's diaper bag. Watts rolled down her car window a few inches and passed the paycheck to Groseclose through the narrow opening. She also showed Groseclose the ice pick that she had brought with her and stated, "If Deborah had been here, and she were hurt, this is what you would have gotten."

Subsequently, on Tuesday, July 4, 1977, Watts learned that the police had found Deborah's body, and on July 7 she buried her daughter. Following Deborah's funeral, on July 8, Watts went with David Foley, Deborah's ex-husband, to the Groseclose home in order to collect her daughter's possessions. These possessions included a wedding band that perfectly matched an engagement ring taken from the Groseclose home by Phillip Britt at the time of Deborah's murder and identified by him at the appellants' trial.

Melville J. Taylor testified on behalf of the State that he had known Groseclose since 1974 when Taylor was a probation officer for the Shelby County Juvenile Court and Groseclose was a volunteer auxiliary probation officer under his supervision. At the time of Deborah Groseclose's murder, Taylor was a campus police officer for the University of Tennessee at Memphis. On Monday, June 27, 1977, Taylor encountered Groseclose unexpectedly at a convenience store in Memphis called the Cracker Barrel Quick Stop. Groseclose was accompanied by a man whom he introduced as Barton Mount. During this chance encounter, Groseclose asked Taylor if he could borrow money. Taylor agreed to loan the appellant $50, which Groseclose promised to repay within one week. At trial, Taylor could not otherwise recall the content of his conversation with Groseclose. However, Taylor acknowledged that in a July 5, 1977 statement to the police he related Groseclose's comment to him that the appellant had been in Kingsport the previous week looking for a new job and had received a job offer.

Taylor also testified at trial that on Wednesday, June 29, he received "six, seven, eight, or nine" messages from Groseclose on his telephone answering machine, the first message having been recorded at approximately 11:00 a.m. In his messages, Groseclose indicated that he needed to speak with Taylor. Groseclose's voice sounded excited and urgent. When Taylor returned Groseclose's calls at approximately 5:00 p.m., Groseclose asked him to come to Groseclose's home. When Taylor arrived, the appellant stated that his wife had disappeared and that he was concerned for her safety. Accordingly, Taylor volunteered to drive Groseclose along the route that Deborah would most likely have taken to her workplace that morning.

During the ensuing, unsuccessful search, Taylor drove his truck, and Groseclose sat in the passenger's seat. While Taylor looked for Deborah's vehicle, Groseclose simply stared down at the floorboard with his hands on his face. They returned to Groseclose's home at approximately 10:30 p.m. or 11:00 p.m. At some time before Taylor's departure, Groseclose repaid the $50 loan. Taylor concluded at trial that, on June 29, 1977, Groseclose "acted upset but not upset." Taylor explained that Groseclose's emotional state appeared somewhat contrived.

The State additionally presented the testimony of Richard Sojourner that, on June 29 or 30, 1977, he was an officer with the Memphis Police Department and received a missing person

report on a woman named Deborah Groseclose. Sojourner recalled that, pursuant to the missing person report, he spoke with Deborah's family members, including her mother and her husband, and also spoke with several of Deborah's acquaintances. Groseclose informed Sojourner that, on Tuesday, June 28, his wife had been confronted in a parking lot by a stranger as she was walking toward her car after work, and the stranger had followed Deborah home. Groseclose further recounted to Sojourner that he was at home when his wife arrived and that she was "frightened, upset." He recalled that he observed an unfamiliar vehicle being driven away from the house but was unable to discern the license plate number. Groseclose remarked to Sojourner that

> [h]e had gotten angry at Debbie because she refused to park in what he considered to be . . . a safer area in the parking lot [at work]; that the people that she worked for had paid her an additional fee to pay for the parking, yet she opted to park in a free area of the parking lot. And she was going to change and start paying to park in a safer area. But he indicated that she had been working there for five years and that there hadn't been any accidents or anything, and it was about time for something to happen.

Groseclose provided to Sojourner descriptions of both the threatening stranger and his vehicle. Specifically, Groseclose described the stranger as "a male white with longer brown hair. He had on a sleeveless-type jacket that [Deborah] thought had a motorcycle-type emblem on it or something of that sort." Groseclose also described the stranger's vehicle as "a '68 or '69 Chevrolet Impala, [dark] red, and it had license plates that were green on white. He was very certain about the make of the vehicle - - had indicated that he had, for a short period of time, worked for [G]eneral [M]otors and described the similarities between the two-year model vehicles."

Groseclose also related to Sojourner that, on the morning of his wife's disappearance, he last saw her at home putting on the uniform that she was required to wear for work. Groseclose had to drive to the Navy recruiting station that morning to pick up a paycheck, and, when he left, Deborah was partially dressed. Specifically, she was wearing pants, but the matching top was still hanging in the laundry room. When Groseclose returned from the recruiting station, "[Deborah's] car was gone, and that uniform was gone, and her purse was gone." Deborah's car was a "white over green" 1970 Plymouth Fury III convertible.

Groseclose admitted to Sojourner that he and his wife had been experiencing marital difficulties but asserted that "they had been working on them, and things seemed to be improving." Groseclose also confided to Sojourner that Deborah's mother had threatened him with an ice pick after learning of Deborah's disappearance and had taken charge of his and Deborah's son Nathan. Sojourner recalled that Groseclose was not concerned about his son's safety but did seem concerned about his wife and appeared to cooperate in Sojourner's investigation. Indeed, Groseclose informed Sojourner that, on the evening following his wife's disappearance, he had unsuccessfully searched for her with the assistance of an acquaintance who was also a police officer or a reserve police officer. Sojourner ultimately distributed a missing person bulletin and a photograph of Deborah throughout the Memphis Police Department.

Officer William Rhodes of the Memphis Police Department testified that, on Tuesday, July 4, 1977, at approximately 12:05 p.m., he was dispatched to Memphis' main public library on Peabody and McLean streets to investigate a suspicious vehicle that was parked in the library's parking lot and emitting a strong odor. Rhodes recounted at trial that, when he arrived in the parking lot, he observed a green "Plymouth Fury III" convertible with "an extreme amount of flies on the trunk." He detected an "extreme strong sweetening-type sickening odor along with the massive amount of flies." He related to the jury that the smell coming from the parked vehicle was similar to "[s]omething in advanced stages of decay or petrifaction. And I've smelled both human and animal before, and it fit in that category."

Rhodes further recalled that earlier on July 4 he had overheard a broadcast concerning a missing woman, which broadcast described the woman's vehicle as a "white over green convertible" and included the vehicle's license plate number. Rhodes had recorded the broadcast license plate number and was quickly able to match it to the license plate number of the abandoned vehicle in the library parking lot. Accordingly, Rhodes "advised the dispatcher that I needed my lieutenant. I needed homicide division, and I needed the crime-scene division to my scene." When the police ultimately opened the trunk of the abandoned vehicle, they discovered "a badly decomposed female."

Dr. Charles Warren Harlan, a forensic pathologist and a member of the Shelby County Medical Examiner's staff, testified at trial that he too was dispatched to the parking lot of Memphis' main public library on July 4 and witnessed the opening of the abandoned vehicle's trunk. At trial, he recalled his initial view of the trunk's contents:

> The body was that of a decomposing female human being, and the person was clothed in a garment which originally had apparently been white. And the person was in a position so that they were lying on their back with their feet and arms underneath or beneath them.

The doctor was immediately able to estimate that the woman had been dead for between four and ten days. He ordered that the body be removed from the trunk and transferred to the medical examiner's morgue.

In performing an autopsy, Dr. Harlan first consulted with a forensic odontologist, Dr. Harry Herbert Mincer, for the purpose of identifying the body. He thereby confirmed that the body had belonged to Deborah Groseclose. Dr. Harlan then performed external and internal examinations of the body in addition to a toxicological examination. The latter revealed a blood-alcohol level of .09 and trace amounts of carbon monoxide. Harlan noted that the blood-alcohol level was consistent with levels of ethyl alcohol produced during the decomposition of a body. The trace amounts of carbon monoxide were "consistent with car exhaust."

The external examination of Deborah's body revealed the presence of four stab wounds in Deborah's back and four corresponding slits in her clothing. The stab wounds were located "reasonably close together" either "in the midline" or "slightly to the left of midline in the back." They measured, approximately, between one and one-quarter inches and two and one-half

inches in depth. The doctor concluded that the wounds had been inflicted prior to Deborah's death and, moreover, were not themselves lethal.

An internal examination of Deborah's body suggested to Dr. Harlan that the cause of Deborah's death was systemic hyperthermia or "total body overheating." The doctor explained "systemic hyperthermia" to the jury:

> The mechanism of death from systemic hyperthermia is that the body has certain regulatory mechanisms that enable it to keep its body temperature in a certain range. One of those includes the presence of fluids in the body. In an attempt to maintain body temperature in adverse hot environments, the person will sweat and will perspire, and this is significant because the evaporation of water from the body surfaces acts just the same as an air conditioner in that it cools the body.
>
> You can see the same thing if you're hot and sweaty and you stand in front of a fan. You will feel cooler than the normal air temperature around you, and that's because you're evaporating the water much more rapidly.
>
> As the body temperature goes up, and as you lose more of the water, eventually you lose so much water that you can no longer properly regulate the body temperature, and the body temperature goes up much more rapidly.
>
> The problem with the body temperature going up is that when you reach a body temperature of about 107.5 degrees fahrenheit, you start to coagulate the protein in the body. Basically you cook.

Dr. Harlan recalled that, on Wednesday, June 29, 1977, the temperature in Memphis rose from seventy-five degrees Fahrenheit to approximately eighty-five degrees before 11:00 a.m. and ultimately peaked at ninety-three degrees in the afternoon. He further recalled that the area of the library parking lot in which Deborah's vehicle was parked was not shaded by any trees. The doctor opined that, "with an ambient temperature . . . in that area of somewhere around 90 degrees," the temperature in the trunk would have reached between 120 and 130 degrees Fahrenheit. Accordingly, the body temperature of a person locked in the trunk would reach or exceed 107.5 degrees within one to four or five hours. Dr. Harlan concluded that Deborah "cooked to death in the trunk of that automobile."

Dr. Harlan specifically excluded either manual or ligature strangulation as the cause of death. He conceded, however, that "putting the arm around the throat i[n] what is commonly called a choke hold" would not necessarily leave the physical evidence that commonly results from

manual or ligature strangulation, and a "choke hold" could cause a loss of consciousness or death. Dr. Harlan elaborated:

> [U]nconsciousness in a choke hold . . . can occur anywhere from a matter of a few seconds, normally up to about thirty seconds, and it goes out to a time of three to five minutes. After three to five minutes of occlusion of an airway, then a person is going to die, or an occlusion of the blood flow, unless there is some attempt to bring them back. You begin to see irreversible brain damage at about five minutes. After ten minutes, basically the ballgame is over.

The State additionally presented the testimony of Officer Lavern Childers of the Memphis Police Department's Homicide Bureau that, on July 4, he and his partner, Jimmy Hammers, drove to the Groseclose home and informed Groseclose about the discovery of his wife's body. Childers related to the jury at trial that, upon learning of the discovery, Groseclose displayed no emotion but inquired if his wife had died in an automobile accident. The officers responded that they were unable to provide him with information concerning the manner in which his wife had died and asked that he accompany them to the Homicide Bureau for questioning. Childers recalled that Groseclose was cooperative.

Subsequently, on July 6, Childers and Hammers returned to the Groseclose home. They initially asked that Groseclose identify a purse recovered by police from a nearby Walgreen's drug store. Groseclose confirmed that the purse had belonged to his wife. He also informed the officers that five credit cards were missing and that, although the purse contained no cash, Deborah had customarily carried between five and ten dollars in her wallet. Childers and Hammers next asked Groseclose to describe his activities on the morning of June 29, prior to his wife's disappearance. Groseclose recounted that he left home at approximately 6:00 a.m. to go to work at the Navy recruiting station. When the officers inquired about a white station wagon that had been seen at the Groseclose home on June 29, Groseclose added that a man named "Bill Britt" had visited the house on that day. Groseclose later corrected himself and stated that the man's name was Phillip Britt. In any event, Groseclose related to the officers that he had attempted to recruit Britt into the Navy, but the Navy had rejected Britt's application. Groseclose noted that Britt had probably obtained his address either from his supervisor at the recruiting station or from a man named Mount. Groseclose concluded that his mother-in-law and Britt were the only two people to visit him on the morning of June 29.

On July 8, Childers and Hammers visited the Groseclose residence a third time. On this occasion, the officers questioned Groseclose concerning his activities during the days or weeks preceding June 29. Groseclose recounted to the officers that

> he had gone to Kingsport, Tennessee, on a trip. He came back to Memphis on June 25th and June 26th; and due to the fact that he and his wife, Debbie, had been having marital problems, he stayed in his car at a campground at Lakelan on the night of the 25th and the 26th.
> . . .

. . . .

> And he said that on the 27th, he came home, but he did not spend the night, there again, because of the marital problems.
>
> He said that he had gone over to a man's house named Paul Cooney . . . to talk to him about starting to stay with him. And then we said, "Well, where did you stay?" He said that he stayed in his car, but it was in front of a man's house named Bart Mount. So he spent the night there.
>
> And then the next day, on the 28th, he came home because he and Debbie had an appointment to take the baby to the doctor because she got off work early that day. And they had a clinical appointment, and also an appointment to take him by the hospital. He said they did that, and then they got home on the 28th, and he left about 5 o'clock, or maybe just a little bit after that, and he said that Deborah was going to call the police department and report that a male white had followed her home on the 28th, and she was very frightened about it. She was going to call and tell the police department about that. And then he said, later on that night, at 8 o'clock, I believe it was, that he had an appointment - - or she had an appointment, I'm sorry, to go see a marriage counselor, and also, she was going to go and talk to a good friend of hers named Dallas Kaylor.
>
> And then she came home, and I believe he said she got home around 10:00 or 11:00.

Groseclose concluded that he spent the night of June 28 at the Groseclose home because Deborah "was so frightened about this male white following her home that day." However, he slept on the couch in the living room due to his ongoing marital difficulties. When he left the house the following morning, his wife's car was parked underneath the carport.

J.D. Mattox, a crime scene officer employed by the Memphis Police Department, testified at trial that, on July 4, 1977, he was dispatched to a Walgreen's drug store in the Frayser neighborhood of Memphis. He recounted that, inside the drug store, the employees directed him to a trash collection area at the rear of the store and showed him a white vinyl purse. Upon examining the purse and its contents, Mattox discovered cards and other items bearing the name of Deborah Groseclose. Mattox was unable to recover any latent fingerprints from the purse.

Ken East of the Memphis Police Department's Homicide Bureau testified that, following the discovery by police of Deborah Groseclose's body and a preliminary investigation, he was instructed to locate a man named Phillip Michael Britt. East related to the jury at trial that he was successful in locating Britt, who on July 11 provided a statement implicating himself in

Deborah's murder. On the same day, Britt directed police to a "Union 76" service station where officers recovered two pairs of gloves.

Britt was the State's principal witness at the appellants' trial. He testified that he was forty-one years old and had been incarcerated in the Tennessee Department of Correction for approximately twenty-one years due to his conviction of the first degree murder of Deborah Groseclose. Britt related to the jury that, in June 1998, he was transferred from a minimum security penal facility to a higher grade security facility and, in July 1998, was approached by prosecutors about testifying on the State's behalf in the instant case. The prosecutors referred Britt to an attorney named Trent Hall for assistance in deciding whether to cooperate.

After consulting with Hall, Britt agreed to testify truthfully in the instant case in return for immunity from prosecution for any unindicted crimes relating to the murder of Deborah Groseclose; an agreement by the family of Deborah Groseclose to forego any civil suit against Britt relating to her murder; agreements by both the State and the family of Deborah Groseclose to forego any opposition to Britt's release on parole by the board of probation and parole; an agreement by the State to advise the board of probation and parole of Britt's cooperation in this case; and Britt's transfer from the custody of the Tennessee Department of Correction to another penal facility for the purpose of ensuring his safety.

Britt asserted that, in entering into the above agreement, he was concerned that he would still be subject to prosecution for "[e]specially aggravated rape, especially aggravated robbery, and especially aggravated kidnapping" in connection with the murder of Deborah Groseclose. He noted that defense investigators had advised him of this possibility during interviews in 1998.[1] As to his immunity from any civil suit brought by the family of Deborah Groseclose, Britt noted that he possessed less than one hundred dollars. However, he also noted the possibility of earning more money should he be released from incarceration. He confirmed that he would be eligible for parole the following year. Specifically, a parole hearing was scheduled in December 2000. He conceded that he had previously and unsuccessfully filed numerous petitions for clemency in an attempt to obtain release from the Department and that he believed his chances of being released on parole were very "slim" absent the above agreement.

Britt added that, pending any future release on parole, he had in fact been transferred from the Tennessee Department of Correction to the Bartlett City Jail. In this regard, he conceded that he had previously initiated a lawsuit against the Tennessee Department of Correction due to the Department's provision of inadequate medical facilities for the treatment of Britt's phlebitis. He observed that he was receiving better medical care while incarcerated in the Bartlett City Jail. He

---

[1]At the time of Deborah Groseclose's murder, the offenses of rape, robbery by the use of a deadly weapon, and kidnapping to commit robbery were punishable by imprisonment in the penitentiary for life. Tenn. Code Ann. § § 39-2603, 39-3702, & 39-3901 (1975). Accordingly, these offenses were prosecutable "at any time after the offense[s] shall have been committed." Tenn. Code Ann. § 40-201 (1975); see generally State v. James Webb, No. 02C01-9512-CC-00383, 1997 Tenn. Crim. App. LEXIS 188, at **11-20 (Jackson, February 27, 1997).

related that, approximately every six weeks, investigators from the District Attorney General's office transported him to his doctor's office and also assisted him in obtaining his medications. According to Britt, the District Attorney General's office had agreed to provide these services for the duration of his incarceration in the Bartlett City Jail. He observed, however, that he did not enjoy as many "perks" in the Bartlett City Jail as he had in the Department.

Britt recalled that, three months prior to the instant trial, prosecutors provided him with the transcript of his testimony during the sentencing phase of his 1978 trial. He also reviewed copies of his statements to the police. As to any discrepancy between his testimony at the 1978 trial and the instant trial, Britt explained, "In 1978, we were trying to ease whatever the court was going to do to us. Some things were just not said." Britt asserted that he was testifying truthfully at the instant trial.

With respect to the murder of Deborah Groseclose, Britt recalled that, in the summer of 1977, he was nineteen years old, living with his parents, and employed as a playground director for the Memphis Park Commission. He had one two-year-old son from his brief marriage to appellant Rickman's sister, Lanette. Britt divorced Lanette on June 2, 1977, and, until his arrest for the murder of Deborah Groseclose, had custody of his son. Britt was also an alcoholic and addicted to "speed." He occasionally abused cocaine and marijuana.

Britt further related to the jury that, prior to his employment by the Memphis Park Commission, he had attempted to enlist in the United States Navy. At that time, Britt became acquainted with appellant Groseclose, who processed Britt's application. The Navy rejected Britt's application for medical reasons, but, in the summer of 1977, Groseclose contacted Britt and asked that he visit the recruiting station because "there was a mix up with some of the paperwork from when I had tried to enlist." When Britt arrived at the recruiting station, Groseclose was awaiting him along with Barton Mount. Britt knew Mount, who was a childhood friend, but had not seen him in several years due to Mount's enlistment in the Navy in, approximately, 1975.

Following his meeting with Groseclose and Mount at the recruiting station, Britt began "hanging around" with Mount once again, seeing him perhaps two or three times each week. On one occasion, Britt visited the Groseclose home with Mount and briefly encountered Deborah. In any event, in June 1977, Mount telephoned Britt at home and asked Britt if he knew anyone who would be willing to kill Deborah for a fee. Mount indicated that Groseclose would be willing to pay $50. Britt responded that only a "junkie" would be willing to kill someone for such a paltry sum but agreed to "check around." Contrary to his promise, Britt made no attempt to locate a prospective killer.

One or two days later, Mount called once again and inquired if Britt had found anyone willing to kill Deborah for $50. Britt replied that Mount was not going to be able to find anyone willing to kill the victim for that price. Britt then heard Groseclose's voice in the background saying, "Okay, $200." Mount communicated the increased price to Britt, who again stated that he would "look around." Britt asserted at trial that, once again, he made no attempt to

locate a prospective killer and "had no real intention of trying to find anyone." He explained that he only agreed to "look around" because he wanted to appear to be a "tough guy."

During this time, Britt was also regularly visiting his former brother-in-law, appellant Rickman. Rickman was then living with a girlfriend named Pamela Baker in a Memphis apartment rented by a man named Donnie Tatum. In fact, Tatum had formed a motorcycle gang, the "Avengers," that included himself, Rickman, and Britt. None of the members owned a motorcycle, but each wore a denim jacket with a rebel flag sewn onto the back. During one of his frequent visits to the Tatum apartment, Britt recounted to Rickman his conversations with Mount about the proposed murder of Deborah Groseclose. Rickman in turn stated his willingness to commit the murder. Tatum was home at the time and overheard Rickman's statement. Baker was also home but in a different room.

Britt subsequently called Mount and stated that he had found someone willing to kill Deborah. Mount arranged to meet with both Britt and Rickman at the park where Britt was employed. The meeting occurred between one and one-half and two weeks prior to Deborah's death. At the meeting, Mount

> agreed to the 200 [dollars]. Uh, that when the insurance came in,
> there would be more; and uh, I believe that figure was 500 [dollars]
> more for Ron, and I was to get a hundred dollars just for setting it up.

Mount also informed Rickman where Deborah could be found "at certain times of the week at certain times of the day," stating that he had received the information from Groseclose.

Following the meeting in the park, Mount arranged a second meeting, this time between himself, Groseclose, Britt, and Rickman at a reputedly "gay" bar in Memphis called the Front Page. Britt conceded at trial that he could not recall precisely when this second meeting occurred, noting that it likely occurred the weekend prior to Deborah's murder. In any event, he was able to recall that "the gist of the conversation [at the meeting] was that Bill wanted [the murder] to look like a robbery that had gone bad." Specifically, Groseclose asked that Rickman commit the murder in the middle of the day on Tuesday, June 28, 1977, in a parking lot that was located behind a Krystal's restaurant and in which his wife regularly parked her car while at work. Groseclose described his wife's car and instructed Rickman to leave Deborah's body in her car in the parking lot.

On Monday, June 27, Mount met once again with Britt, Rickman, and Pam Baker at the Front Page. Mount communicated to them the precise parking place in which Deborah's car would be located on June 28, and the three men reviewed the plan formulated at the prior meeting.

On June 28, Rickman drove alone to the parking lot behind Krystal's and awaited Deborah. According to Britt, Rickman reported afterwards that he decided against murdering Deborah in the parking lot because too many people were present. Instead, when Deborah got into her car and drove out of the parking lot, Rickman followed her for approximately eight or ten miles. Rickman also reported to Britt that Deborah appeared to notice that Rickman was following her. At

-15-

the time, Rickman was driving Pam Baker's car, an "ugly red or a brown" car with Oklahoma license plates. Rickman's hair was curly and long enough to cover his ears, and he was wearing his "Avengers" jacket.

Following the aborted murder attempt, Britt telephoned Mount and arranged another meeting between Groseclose and Rickman that same evening at a Shoney's Restaurant. Pamela Baker accompanied Rickman to the restaurant. Britt, however, did not attend the meeting, only later meeting with Rickman at the Tatum apartment. Both Pamela Baker and Tatum were present in the apartment, albeit Britt was unsure whether Baker overheard the ensuing conversation. During this conversation, Rickman confirmed that he had met with Groseclose at Shoney's, and Rickman related the newly revised plan to murder Deborah. Tatum indicated that he was unable to assist Rickman in committing the murder due to his work schedule. Rickman therefore informed Britt that he would have to participate in the murder. According to the newly revised plan,

> when we got to the [the Groseclose home] [on the morning of Wednesday, June 29], Bill would meet us - - that there was a shed in the back. We would stay there until he left with the baby. And we were to rape her and kill her and then put her in the car and take her to the parking lot where she normally parked and leave the car there.

Britt did not object to participating in the murder, explaining at trial that he was afraid of Rickman. Britt asserted that he had previously "seen [Rickman] scuffle with guys before. I knew what he could do."

At approximately 11:00 p.m. on the night before Deborah's murder, Britt left his car, a white 1966 Chevrolet station wagon, in a parking lot adjacent to the one behind Krystal's in which Deborah regularly parked her convertible. Rickman and Pamela Baker followed Britt in Baker's car and drove him back to the Tatum apartment, where he and Rickman drank beer all night. Britt explained that he drank beer throughout the night preceding the murder because he "wanted to be numb." In the morning, Britt was drunk but "functional."

At approximately 5:00 a.m. on June 29, Baker drove Rickman and Britt to a location within five blocks of the Groseclose residence. Britt was not carrying any weapons. He recalled, however, that Rickman always carried a pocket knife with a three-and-one-half or four inch blade. As planned, Groseclose met Britt and Rickman at the gate to his backyard. He led them to a shed, which he unlocked, instructing them to "[h]ang around in here until I leave." While Rickman and Britt waited, Groseclose brought them cigarettes. Ultimately, Groseclose left the house in his van, taking his infant son with him and leaving a rear, sliding patio door unlocked. Deborah's green Plymouth convertible was parked in the carport. The sun was beginning to rise.

Rickman and Britt entered the house through the patio door. Britt recounted that both he and Rickman were wearing gloves that they had obtained from the shed outside. His gloves consisted of a camouflage material, and Rickman's were white. After entering the house, Rickman advanced to the bedroom, where Deborah, dressed in a nightgown, was dozing on the bed. Britt remained in the bedroom doorway. According to Britt, Rickman stood over Deborah, who soon

-16-

opened her eyes. When she saw Rickman, she tried to roll off of the bed. While screaming for her husband, she noticed Britt standing in the bedroom doorway. Rickman then placed his hand on her shoulder and said, "Don't do that again." When Deborah froze, Rickman further instructed her to undress. Deborah complied, and Rickman was pulling down his pants when Britt left the bedroom and went into the living room. Sometime later, Rickman instructed Britt to return to the bedroom and stated that it was his "turn." Accordingly, Britt raped Deborah. Britt recounted that he spoke to Deborah during the rape and asked her if she hated them. She replied that she was afraid.

After being raped, Deborah was "[v]ery quiet." Rickman and Britt permitted her to take a bath and dress in a nurse's uniform. While Deborah was bathing, Rickman spoke with her and informed her that he and Britt had been hired to kill her. Upon hearing this, Deborah was silent for approximately one minute. She then asked Rickman how much he was being paid. Rickman responded that he was being paid $1,000, whereupon Deborah offered to pay him more money in return for sparing her life. At this point, Britt left the bathroom, went into the kitchen, and obtained a soda from the refrigerator. While waiting for Rickman and the victim, Britt also searched Deborah's purse. He removed a First Tennessee Bank card and eight dollars and some change. He conceded that he may also have taken some credit cards.

After searching Deborah's purse, Britt returned to the bedroom, where Deborah was now getting dressed. Britt asked her for the personal identification number (PIN) assigned to the First Tennessee Bank card. She informed him that the PIN was written on a piece of paper in her wallet. According to Britt, Deborah was "remarkably calm." Britt obtained the piece of paper from her wallet and, while still in the bedroom, also removed a diamond engagement ring from a jewelry box. Britt recalled at trial that he later gave Deborah's ring to a girlfriend. He identified at trial the ring that he removed from the Groseclose home and gave to his girlfriend.

After Britt had taken the diamond engagement ring, Rickman instructed him to "[g]o to the front of the house." Britt returned to the living room and also went into the kitchen, rummaging through Deborah's purse once again. At some point, Britt heard Rickman calling urgently to him. When Britt arrived in the bedroom, Rickman was choking Deborah. Specifically, Rickman was standing behind Deborah with his right hand against Deborah's throat and his "left wrist [intersected] below [his] right wrist to perform some sort of leverage." Deborah was kneeling on the floor and attempting to scratch Rickman's face. Rickman instructed Britt to hold Deborah's hands, and Britt held her hands for approximately 30 seconds until she "went limp." Rickman next instructed Britt to check Deborah for a pulse. As Britt checked her wrist, however, Deborah "was unbalanced" and fell to the floor, hitting her head and moaning or gasping.

Once more, Rickman instructed Britt to leave the bedroom, and Britt went into the living room, turning on the radio "[t]o, I guess, mask any sound that would . . . be coming from back in the back so I wouldn't have to hear it and so nobody else would." Britt also peered out the window. By this time, he and Rickman had been in the house for at least one hour.

A few minutes later, Rickman called Britt back into the bedroom and asked him to once again check Deborah for a pulse. Britt was unable to find any pulse and could not hear Deborah's heartbeat when he placed his head on her chest. Britt also held his hand in front of her nose and mouth and was unable to detect any breath. Britt noticed that blood was flowing from Deborah's nose. He did not, however, notice that she was bleeding from any other location. Moreover, he denied at trial ever witnessing Rickman stab Deborah or stabbing Deborah himself.

Believing Deborah to be dead, Britt retrieved her car keys from a hook in the kitchen, Groseclose having previously told Britt and Rickman where they could find the keys. Britt then went to the green Plymouth convertible and opened the trunk. He removed a playpen and threw it into the yard before assisting Rickman in carrying Deborah to the car. Britt recalled, however, that he "couldn't hold her," and Rickman "ended up picking her up and carrying her," somehow staining his shirt with blood. Rickman placed Deborah on her back inside the trunk of her car.

As Rickman and Britt drove away from the house in Deborah's car, Britt noticed that the sun had fully risen and "it was really hot - - I mean really hot." He and Rickman stopped once "[j]ust south of the Gracie Mae Smith Bridge" to push the convertible top down. They each continued to wear at least one glove, and Britt conceded that they may have attracted someone's attention at the intersection of Chelsea and Watkins streets. Britt recalled that they listened to music while in the convertible, and Britt denied ever hearing Deborah make any sound in the trunk. Contrary to their original plan, they drove to the main public library in Memphis and parked the car in the library parking lot.[2] At that time, there were no other cars in the parking lot. He and Rickman then began walking to the parking lot where they had left Britt's car the previous night.

En route to Britt's car, Rickman and Britt left their gloves in a storage space behind a "76" gas station on Union Street. They also attempted unsuccessfully to withdraw money from an automated teller machine (ATM) using Deborah's First Tennessee Bank card, afterwards tearing up the ATM card and throwing it out the window of Britt's car. They also threw out the window the piece of paper on which Deborah had written her PIN and Rickman's blood-stained shirt. Finally, Britt and Rickman went to a place called "Big Daddy's," where they purchased hamburgers and sodas using the small amount of money obtained from Deborah's wallet.

Rickman and Britt returned to Rickman's apartment at approximately 9:00 a.m. Britt lay down on the couch in the apartment. Pamela Baker was also in the apartment, and Britt remarked to her that Deborah "wouldn't die." Britt explained at trial that he was referring to Rickman's unsuccessful attempt to strangle the victim. Ultimately, Britt returned home to his parents' house, informed his mother that he was ill, and went to bed.

---

[2]Interestingly, Britt further recalled that, sometime after 10:00 p.m. on the day following the murder, he returned to the library parking lot and discovered that Deborah's convertible was gone.

Later on June 29, Rickman realized that he and Britt had left Deborah's purse at the Groseclose home, and he became concerned that police might find this detail suspicious. Accordingly, Rickman instructed Britt to call Groseclose and discuss the problem with him. Britt and Groseclose agreed that Britt would go to the Groseclose residence on the pretext of borrowing a speed wrench and obtain the purse. Britt drove to the Groseclose residence in his white Chevrolet station wagon. A woman whom Britt later knew as Deborah's mother was on the front porch, having just emerged from the house. She seemed to be "upset, agitated" and said something unintelligible to Britt. When he asked her to repeat what she had said, she stated, "Let Bill tell you." She then returned inside the house, and Groseclose emerged, handing Britt a speed wrench and a paper sack containing Deborah's purse. In accordance with additional instructions he had received from Rickman, Britt then asked Groseclose to amend the second installment due on the murder contract, which installment was tied to Groseclose's receipt of life insurance proceeds, from $500 to $300 and Groseclose's .45 semi-automatic pistol. Groseclose replied, "Brother, you've got a deal."

After leaving the Groseclose residence, Britt threw Deborah's purse into the garbage at a convenience store located several blocks from the Groseclose home. He then returned to the Tatum apartment. Later, Rickman and Britt called Groseclose from a pay telephone at a nearby 7-Eleven. Rickman spoke with Groseclose on the telephone. Britt recounted:

> He looked at me when he was talking on the phone he said, "No, it was from her nose." I said "What"? He said, "He asked me where the blood came from," and he said, "It was from her nose," and Ronnie had this an off - - it was like he was kind of shocked by what he heard, and then kind of amused, too. He said that Bill said he had hoped it came from the other end.

At some point, Britt and Rickman drove to Mount's home in Baker's vehicle and obtained the initial $200 installment due on the murder contract. Afterwards, Britt and Rickman returned to Tatum's apartment, where Rickman began working on Baker's car. The landlady soon emerged and complained that they were playing the car radio too loudly. Accordingly, Rickman paid her a portion of the $200 toward Tatum's rent.

On July 4, Britt was celebrating Independence Day at his parents' home when he happened to pass by a television during a news report that the police had found Deborah's body. According to Britt, the "4th of July was shot." He drove to Tatum's apartment and informed Rickman of the police's discovery. Because Tatum did not have a television, Rickman and Britt went to a neighbor's apartment to watch the news together.

Britt again met with Rickman on July 8 or 9 at the Front Page. On this occasion, they learned that the police had visited the Front Page and had shown employees a sketch of a man who looked like Rickman. Rickman left the bar almost immediately thereafter. On July 9, the police visited Britt's home and asked him if he would be willing to come to the police department and answer questions about the murder of Deborah Groseclose. Britt agreed to answer any questions but lied to the police on this occasion, denying any involvement in the murder. On July 11, the police

again asked that Britt accompany them to the police department and answer questions about Deborah's murder. On this occasion, Britt confessed to participating in the murder and implicated Rickman, Mount, and Groseclose. After confessing, Britt also led the police to the location where he and Rickman had discarded the gloves used during the murder.

Britt conceded that from January 1977 to July 1977 he "tried" to be "totally fried." Moreover, he conceded that he had previously told defense investigators that he did not remember the events of 1977. He explained, however, that he claimed memory loss because,

> at that point, I had no legal representation. Nobody was putting anything on the table except, "We need your help." I told your investigator, the other investigator, and the D.A.'s the exact same thing. Everybody had the same information on all sides, the playing ground was level.

He did concede that "some things [in 1977] are blurred together." However, he then elaborated:

> I live it every day. I dream about it. I see the events. I'll live with it forever. Yeah, I know what happened. I know what was said. And I also know what I said to the investigators and those people sitting right there to your left, and if you also read, in your investigator's reports, I said, "I don't know which way I'm going to jump yet." - - I didn't know which side I was going to go. But yes, sir, I remember it.

Anthony Joseph Scola and Royce Wolfe, who were employees of a Memphis company named Motion Industries at the time of Deborah's murder, confirmed at the appellants' trial that, sometime after 7:15 a.m. on a morning in June 1977, a green convertible was stopped on the Gracie Mae Smith Bridge. According to Scola and Wolfe, they noticed the convertible as they drove to work because two white men were manually attempting to push down the convertible top. Soon thereafter, Scola and Wolfe again observed the vehicle stopped at a traffic light at the intersection of Chelsea and Watkins streets. At this time, Scola and Wolfe noticed that the two occupants of the convertible were wearing gloves despite the heat of the summer morning. Specifically, the driver was wearing "white painter's gloves," and the passenger was wearing gloves consisting of a vinyl camouflage material.

Jeanne Griffis, a thirty-three-year employee of the First Tennessee Bank, testified that she is the custodial records officer for the bank. She related to the jury that, according to the bank's records, Groseclose opened an account with the First Tennessee Bank on August 6, 1976, and added Deborah's name to the account on August 10, 1976. Accordingly, the bank issued two ATM cards for this account. Card Number One belonged to Deborah Groseclose, and Card Number Two belonged to Groseclose. The following transactions occurred between June 22 and June 29, 1977:

| June 27, 9:00 p.m. | Card No. 2 | Hollywood & James | Balance Inquiry: | $145.89 |
| | | | Withdrawal: | $100 |
| | | | Balance Inquiry: | $45.89 |
| June 28, 6:35 p.m. | Card No. 2 | Hollywood & James | Balance Inquiry: | $45.89 |

|                                  | Withdrawal:      | $40   |
|----------------------------------|------------------|-------|
| June 29, 9:06 a.m.   Card No. 1   Hollywood & James | Balance Inquiry | $5.89 |

Griffis confirmed that all of the above transactions would have required a PIN. She further noted that, in 1977, not all ATM machines were equipped with video cameras, and she had been unable to ascertain whether the ATM machine on Hollywood and James streets was so equipped.

Mary Vance testified on behalf of the State that in 1977 she was the manager of Frayser Manor Apartments in Memphis and lived at the apartment complex with her husband Ralph and her son Ralph, Jr. Vance recalled that in 1977 a man named Donnie Tatum was renting one of the apartments in her complex. In June 1977, Tatum informed her that a friend named Ronald Rickman would be staying in his apartment for some time. Vance noted that Rickman did in fact live in the Tatum apartment for approximately two weeks, and she also recalled seeing a woman visiting the apartment.

Vance further testified that, on June 27, 1977, between 10:30 p.m. and 11:00 p.m., Tatum, Rickman, and another man were working on a car outside Tatum's apartment and playing a radio loudly. Accordingly, she went outside and asked the three men to reduce the volume. At the time, Tatum was in arrears with his rental payments. She recalled that, on this occasion, Rickman gave her $100 toward Tatum's rent in five $20 bills.

Ralph Vance, Jr., testified that in June and July 1977 he was unemployed due to an injury but was assisting his mother in performing her duties as a resident manager of Frayser Manor Apartments. Vance, Jr., knew both Tatum and Rickman and was aware that a woman was also living in the Tatum apartment. He recalled that both Tatum and Rickman regularly dressed in Levi "cut-off" "[m]otorcycle-type" jackets.

William Hylander, an officer with the Homicide Bureau of the Memphis Police Department in the summer of 1977, testified that on July 12 of that year he traveled to Tulsa, Oklahoma with Sergeant Ken East for the purpose of acquiring custody of Ronald Rickman, who had been arrested by the Tulsa Police Department. Upon their arrival in Tulsa, the officers first interviewed Rickman's girlfriend, Pamela Baker. They then met with Rickman, showed him the warrant authorizing his arrest for the murder of Deborah Groseclose, and advised him of his Miranda rights. Rickman was cooperative and provided the police with a written statement.

Hylander read to the jury a version of Rickman's statement that was redacted to omit all references to appellant Groseclose. In brief, Rickman confessed to killing Deborah Groseclose with the assistance of Phillip Britt because they "were paid to." According to Rickman, the murder contract originally provided that he would receive $200 prior to the murder and another $500 afterwards. The amount of the second installment was later amended to $300 and "a military .45 pistol." Rickman confirmed that he and Britt raped and murdered Deborah inside the Grosecloses' Memphis home before placing her body inside the trunk of her car and abandoning the car in the parking lot of Memphis' main public library. He noted that, after initially confronting Deborah on the morning of her murder, he briefly reconsidered his plan to kill her. However, he decided to

-21-

proceed as planned because he "was afraid she would get to the police before we could get out of town." According to Rickman, he initially attempted to kill Deborah by "choking her." When his efforts proved unsuccessful, however, he used a pocket knife to "stab[] her in the back close to her spine." Rickman emphasized to police that "Pamela Baker had no dealing with [the murder]."[3]

Pamela Baker, who was named Pamela Rogers at the time of the appellants' trial, testified on behalf of the State. Baker testified that she was raised in Tulsa, Oklahoma and, in March 1977, drove to Memphis, Tennessee to visit her brother. She was eighteen years old and drove a brown 1971 Dodge Monaco with green and white Oklahoma license plates. She ultimately moved to the Frayser neighborhood of Memphis and obtained a job working at a local 7-Eleven. While employed at the 7-Eleven, she met appellant Rickman. Soon thereafter, she developed a relationship with Rickman and began living with him in the Tatum apartment. Her relationship with Rickman continued until his arrest for the murder of Deborah Groseclose. In all, the relationship lasted between three weeks and one month. Baker noted that, during the course of her brief relationship with Rickman, he was "always" telling her that "something was none of my business."

Baker also recalled at trial that she and Rickman often "hung out" at a bar called the Front Page. Moreover, she noted that Rickman began having frequent meetings with several friends, including Britt. Baker described one meeting between Rickman, Britt, and Barton Mount in a park. She also remembered witnessing a meeting between Rickman and Groseclose at a Shoney's restaurant in Frayser. On the latter occasion, Rickman and Groseclose spoke about Groseclose's wife. Groseclose mentioned that his wife had been followed home by a stranger one day, and he showed Rickman a picture of his wife. Baker added that, sometime after June 29, 1977, she drove both Rickman and Britt to the Groseclose home because Britt wanted to borrow a tool.

Baker conceded at trial that, at some point, she overheard "something about [Rickman] being approached to commit a murder. And I asked him about it, and he said that he had." Baker attempted to dissuade Rickman from committing the murder. Specifically, she testified, "I tried to talk him out of it. I couldn't understand why he could do it or how he could do it or, you know, there was no reason good enough. And he said that he didn't know the person; they didn't mean anything to him; he was doing it for the money." Baker conceded that she did not attempt to run away or contact the police. She explained that she believed she had been successful in her efforts to dissuade Rickman from committing the murder.

However, on July 4, she and Rickman were at a neighbor's apartment watching television, and Rickman exhibited an unusual interest in a news report concerning the discovery of Deborah Groseclose's body. Moreover, she recalled one occasion on which she observed Phillip Britt seated on the couch in the living room of the Tatum apartment, and "[h]e was rocking back and

_____

[3]With respect to Rickman's confession to the police, the trial court instructed the jury at the close of the State's proof "that those statements . . . [are] being offered to you, and you are only allowed to consider it as it applies to the guilt or innocence of Ron Rickman. You cannot use that information, in any regard as to the guilt or innocence of Bill Groseclose."

forth and saying that she wouldn't die - - just repeatedly over and over again." Rickman attempted to calm Britt, and Baker left the room. Later, however, she confronted Rickman and asked if he had murdered Deborah Groseclose. Rickman "described what they had done, and he was pretty upset that I had found out." In fact, Rickman produced a hand grenade and began waiving it about, exclaiming "[A]nybody who turns me in or anybody who says anything about it, I'll see to it that they die."[4]

Soon thereafter, Rickman shaved his head with Baker's assistance, and they drove to Tulsa, Oklahoma. Baker noted that the decision to leave Memphis was Rickman's, albeit she wanted to return home to Tulsa. In Tulsa, she and Rickman stayed at her mother's home. Within a very short period of time, however, the police appeared at her mother's home and arrested Rickman. Baker concluded that she had been trying to forget the events of the summer of 1977 ever since.

Ronald Ralph Casper testified that in 1977 he was a gunnery sergeant in the United States Marine Corps. He was assigned to the United States Naval Air Station in Millington, Tennessee, and resided at Frayser Manor Apartments. While living at that apartment complex, he became acquainted with Pamela Baker, who in turn introduced him to Ronald Rickman. Casper recalled that, on July 4, Rickman and Baker visited Casper's apartment, ostensibly because their apartment was not air conditioned. While visiting Casper's apartment, Rickman and Baker watched television, exhibiting special interest in news reports concerning the Groseclose murder. Upon watching these news reports, Rickman requested Casper's permission to use the telephone. Casper granted Rickman permission and observed him dial a telephone number from memory and ask to speak with "Bill."

Casper also saw Rickman and Baker on July 6 when they visited Casper's apartment in order to watch the 5 o'clock news, again exhibiting interest in the Groseclose story. Rickman again used Casper's telephone, dialing a telephone number from memory and asking to speak with "Bill."

On July 7, Rickman and Baker visited Casper's apartment once more but missed the evening news reports. Rickman inquired concerning the contents of the news reports and then asked permission to use the telephone. Upon receiving Casper's permission, Rickman dialed a telephone number from memory and this time asked for "Phil." Subsequently, he made a second telephone call and asked to speak with "Bill Groseclose." After using the telephone, Rickman mentioned to Casper that he might be moving.

Finally, on July 8, Rickman and Baker briefly visited Casper's apartment and confirmed that they were leaving Memphis. Rickman indicated that they were going to North Carolina. Casper noticed on this occasion that Rickman had shaved his head.

---

[4]The trial court instructed the jury at the close of the State's proof that it could only consider Baker's testimony concerning this threat in determining Rickman's, as opposed to Groseclose's, guilt or innocence.

The State also read to the jury the transcript of Barton Wayne Mount's direct testimony at the appellants' original trial in 1978. As a foundation for introducing Mount's former testimony, the State presented the testimony of Sue Waddell, a deputy clerk for the Shelby County Criminal Court. Waddell testified that she is responsible for maintaining court records and identified the transcript of Mount's 1978 testimony. She further testified that court records contained a death certificate issued by the Minnesota Department of Health pertaining to Barton Wayne Mount. The death certificate indicated that, on November 15, 1993, Mount committed suicide. Waddell also related to the jury on the basis of court records that, following his testimony at the 1978 trial and well before his death, on November 27, 1977, Mount pled guilty in the Shelby County Criminal Court to the second degree murder of Deborah Groseclose in return for a sentence of ten years.

At the 1978 trial, Mount testified that he was twenty years old, had been indicted for the first degree murder of Deborah Groseclose, and was currently incarcerated. He denied, however, receiving any promises or guarantees from the State in return for his testimony. He then related to the jury that he was enlisted in the United States Navy and had served in the Navy since March 28, 1976. Mount observed that Groseclose had been his Navy recruiter and that, prior to Deborah's murder, he saw Groseclose daily. According to Mount, he assisted Groseclose in performing his duties as a recruiter and also "spent social time with him." Mount similarly admitted that he had known Phillip Britt for nine years and was acquainted with Ronald Rickman. Finally, he confirmed that, in June 1977, he assisted Groseclose in negotiating a contract with Rickman and Britt to kill Deborah Groseclose. He stated that he and Groseclose intended to live together following Deborah's murder. Indeed, Groseclose intended to use a portion of the proceeds from the insurance policies on Deborah's life to make improvements to his home and buy Mount a new truck.

Both Groseclose and Rickman declined to testify on their own behalf. Rickman did, however, present the testimony of Louis Key. Key testified that he knew Barton Mount, having encountered him at the Memphis Correctional Center in 1978 and 1979. Key had been convicted of burglary and was serving a sentence of ten to fifteen years incarceration.[5] Mount worked with Key performing custodial duties. According to Key, Mount informed him that he had killed Deborah Groseclose at the main public library in Memphis. Mount recounted to Key that he opened the trunk of the car in which Deborah was confined and, because she was still alive, stabbed her.

---

[5]Key conceded to the jury that he was also convicted of aggravated sexual battery in 1993 and sentenced to eight years incarceration in the Tennessee Department of Correction.

Mount explained to Key that he was in love with Groseclose and hated Deborah.[6] Mount asserted that Groseclose had "no kind of involvement" in Deborah's murder.

Groseclose presented the testimony of Lanette Thompson, Britt's ex-wife and Rickman's sister. She testified that she was married to Britt from August 22, 1974, until June 2, 1977. She observed that she had since maintained sporadic contact with Britt through their son, Jeremy Michael Britt, and had last spoken with Britt "face to face" five years prior to trial. She opined that her ex-husband was "not a very truthful person."

Groseclose also presented the testimony of Gary King. King testified that he lived in Kingsport, Tennessee, and was currently a service manager for Bill Gattis Chevrolet and Cadillac in Bristol, Tennessee. He stated that he knew Groseclose in the 1970s because Groseclose worked along with King at Looney's Chevrolet and Cadillac in Kingsport, Tennessee as an alignment technician for three or four years. King described Groseclose as a "prankster." In any event, following his employment at Looney's, Groseclose moved to Memphis. Subsequently, in the mid- to late-1970s, Groseclose visited the dealership. King testified that the visit occurred shortly before King learned of Deborah Groseclose's murder. King noted that Groseclose never attempted to borrow money from him during the visit.

The evidence summarized above produced verdicts of guilt at the conclusion of the appellants' trial. Again, Groseclose now challenges his conviction of being an accessory before the fact to first degree murder on the grounds that the trial court failed to sever his trial from that of Rickman; the trial court admitted into evidence Mount's former testimony; the trial court excluded

---

[6]The trial court provided the following contemporaneous instruction to the jury:

> With regard to the testimony regarding Mr. Mount's feelings toward Bill Groseclose and Deborah Groseclose, that was a statement made sometime in 1978 or 1979. That statement is being offered to you as a statement of what Mr. Mount's mental feelings or thoughts were in 1978 or 1979. Do you understand?
>
> . . . .
>
> It has no bearing on what his mental thoughts were or his feelings were on June the 29th, 1977. Do you understand?
>
> . . . .
>
> This is called his then-existing state of mind at the time he made the statement with regard to his feelings about Mr. Groseclose and Mrs. Groseclose. That's what his feelings were on the day he made this statement. That's all it's being offered to you to show. Do you understand that?
>
> . . . .
>
> It's not being offered to show what his feeling were on June the 29th of 1977. Does every body understand the distinction?

testimony by Gary King; and the evidence is insufficient to support his conviction. In challenging his conviction of first degree murder, Rickman joins Groseclose in contesting the trial court's admission at trial of Mount's former testimony.

## III. Analysis
## A. Severance

We first address appellant Groseclose's claim that the trial court erred in failing to sever his trial from that of appellant Rickman. Groseclose specifically contends that a joint trial (1) effectively denied him his right to a speedy trial; (2) resulted in a violation of Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620 (1968); and (3) otherwise prevented a fair determination of Groseclose's guilt or innocence due to the appellants' mutually antagonistic defenses, the disparity in the weight of evidence adduced by the State against each appellant, and appellant Rickman's appearance during the joint trial. The State disputes that the trial court abused its discretion in denying Groseclose's motion for severance.

As noted previously, the United States District Court for the Middle District of Tennessee reversed Groseclose's conviction and sentence on July 28, 1995, and ordered the issuance of a writ of habeas corpus or a new trial. The State's ensuing and unsuccessful appeals of the district court's grant of relief concluded with the United States Supreme Court's denial of the State's petition for writ of certiorari on May 18, 1998. Within days, the State issued capiases for the arrests of both appellants pursuant to the original indictment, and the Shelby County Criminal Court scheduled their arraignments. Indeed, in orders dated June 3, 1998, the United States District Court noted that "the State has acted diligently in initiating the process for . . . retrial." Thereafter, on June 22, 1998, the Shelby County Criminal Court appointed counsel for Groseclose and Rickman and set a new trial date of September 14, 1998.

On August 3, 1998, Groseclose filed a "Notice of Demand for Speedy Trial" and a "Motion for Speedy Trial, or in the Alternative, Dismissal." In his Motion for Speedy Trial, Groseclose asserted that his right to a speedy trial had attached at the time of his arrest in July 1977 and that twenty-one years had since passed. Accordingly, he argued that any continuance of the scheduled trial date of September 14, 1998, would violate his right to a speedy trial and require the dismissal of the indictment in his case.

Simultaneously with his Motion for Speedy Trial, Groseclose filed a motion requesting a severance of his trial from that of appellant Rickman pursuant to the United States and Tennessee constitutions and Tenn. R. Crim. P. 14. Groseclose's grounds for severance included in essence potential Bruton violations flowing from the State's use at trial of Rickman's confession to the police, the appellants' mutually antagonistic defenses, Groseclose's consequent desire to attack at trial Rickman's character and credibility, and the disparity in the weight of the evidence against each appellant.

Also on August 3, 1998, appellant Rickman filed a motion to sever his trial from that of Groseclose pursuant to Tenn. R. Crim. P. 14. Rickman's grounds for severance likewise included

the appellants' mutually antagonistic defenses in addition to the possibility that "evidence which would not be admissible as to one defendant [would be] admissible [as] to another," Groseclose's option at a joint trial to claim constitutional protections against self-incrimination, and counsel's belief that Rickman might be "required" to testify at a joint trial. Moreover, on August 27, 1998, Rickman filed a motion requesting a continuance of the September 14, 1998 trial date in this case and citing his need for a continuance as an additional ground for severance of defendants.

In support of Rickman's motion for a continuance, his attorneys primarily asserted that they were not prepared to proceed to trial on September 14. In this regard, counsel emphasized that neither a thorough investigation of the State's allegations nor a thorough investigation of Rickman's past for mitigating evidence critical to the sentencing phase of the capital proceedings was undertaken prior to Rickman's first trial. Accordingly, notwithstanding counsel's diligent efforts, their investigation in preparation for the retrial was still ongoing, and "a determination of needed experts ha[d] not been [made]." Counsel attached to the motion for a continuance the affidavit of the defense investigator detailing his progress in Rickman's case. Additionally, counsel attached the affidavits of several defense attorneys experienced in capital litigation, in which affidavits the attorneys asserted that capital proceedings entail a minimum of six months or one year pre-trial preparation. Finally, Rickman's counsel professed to be "astonished and amazed" that Groseclose's counsel were prepared to proceed to trial on September 14.

The trial court commenced hearings on the appellants' motions on August 28, 1998. At the August 28 hearing, the trial court specifically addressed Rickman's motion for a continuance. Groseclose's defense counsel confirmed that they were prepared to proceed to trial on the originally scheduled trial date, and the State echoed this assurance. Nevertheless, the trial court indicated its inclination to grant Rickman's motion for a continuance and took the motion under advisement. On the following Wednesday, September 2, the court further addressed Groseclose's motion for a speedy trial and both appellants' motions for severance. The court ultimately denied the appellants' motions for severance and continued the trial date from September 14, 1998, until January 25, 1999, evidently concluding that the latter date was consistent with Groseclose's speedy trial right.

In its order continuing the trial date, the court emphasized that counsel had only been appointed on June 22,[7] leaving approximately three months for counsel to prepare prior to the September 14 trial date. The court further remarked that, notwithstanding their opposition to any continuance of the trial date, Groseclose's defense counsel had indicated to the court on August 31 that they had not yet fully completed their review of the State's files pursuant to the State's "open file" policy.[8] The court concluded that a continuance was warranted

---

[7]In its order, the trial court actually noted a date of June 20, 1998. However, the orders appointing counsel in the appellants' cases were filed on June 22, 1998.

[8]On September 15, 1998, Groseclose's counsel filed a "Report on Discovery" in which they noted that they had completed their review of the State's file on September 2, 1998, and further noted that "they already had copies of
(continued...)

due to the complex nature of this case both for the state and the defense, due to the nature of the various motions in this case which have not been decided by the Court, and finally due to the fact that this case has been reversed once for ineffective assistance of counsel and this court's determination that neither the State of Tennessee nor Mr. Groseclose or Mr. Rickman could adequately be represented under the time constraints imposed up to this point.

Subsequently, during the course of the appellants' joint trial, Groseclose unsuccessfully renewed his motion for severance on four separate occasions. First, he renewed his motion during the testimony of Phillip Michael Britt. At this time, Groseclose argued that Rickman's defense counsel was unprepared to cross-examine Britt and had elicited information damaging to Groseclose's case. Second, Groseclose renewed his motion for severance following the trial court's decision to admit, over counsel's objection, testimony by Ronald Casper that he had overheard Rickman attempting to telephone Groseclose following the discovery of Deborah's body. In essence, Groseclose asserted that the trial court's admission of the disputed testimony constituted a Bruton violation. Lastly, he renewed his motion for severance both at the close of the State's evidence and at the close of all the evidence.

Tenn. R. Crim. P. 8(c) authorizes joinder of defendants in the same indictment when each defendant is charged with accountability for each offense charged in the indictment, the several offenses charged were part of a common scheme or plan, or the offenses "[w]ere so closely connected in respect to time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others." The Advisory Commission Comments to Rule 8 explain that "[p]ermissive joinder of defendants . . . is aimed at achieving improved judicial economy and efficiency." See also State v. Lunati, 665 S.W.2d 739, 746 (Tenn. Crim. App. 1983). Similarly, the United States Supreme Court has remarked that "[j]oint trials 'play a vital role in the criminal justice system.' They promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" Zafiro v. United States, 506 U.S. 534, 537, 113 S. Ct. 933, 937 (1993)(citation omitted).

In this case, both appellants were charged with the first degree murder of Deborah Groseclose, albeit only Groseclose was charged with the then separate offense of accessory before the fact to first degree murder. See, e.g., William E. Groseclose v. State, No. 02C01-9407-CR-00145, 1995 Tenn. Crim. App. LEXIS 707, at **15-16 n.10 (Jackson, August 23, 1995)(observing that, at the time of this offense, "'accessory before the fact' constituted a separate and distinct criminal offense from that of first degree murder, although the punishment was the same"). In any event, the charged offenses were part of a common scheme or plan, and the proof of those offenses intertwined. Indeed, it is undisputed that the joinder of the appellants in the same indictment was

---

[8](...continued)
most of this material" prior to September 2.

permissible under Tenn. R. Crim. P. 8. Rather, the parties disagree about whether Tenn. R. Crim. P. 14, and those constitutional protections underlying the rule, required severance.

As relevant to the instant case, Tenn. R. Crim. P. 14 (c) provides:

(1) If the defendant moves for a severance because an out-of-court statement of a codefendant makes reference to the defendant but is not admissible against the defendant, the court shall determine whether the state intends to offer the statement in evidence at trial. If so, the court shall require the prosecuting attorney to elect one of the following courses:

> (i) A joint trial at which the statement is not admitted into evidence or at which, if admitted, the statement would not constitute error; or

> (ii) A joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been deleted, if, as deleted, the confession will not prejudice the moving defendant; or

> (iii) Severance of the moving defendant.

(2) The court, on motion of the state or on motion of the defendant other than under subdivision (c)(1), shall grant a severance of defendants if:

> (i) Before trial, it is deemed necessary to protect a defendant's right to a speedy trial or it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants; or

> (ii) During trial, with consent of the defendant to be severed, it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants.

The severance of defendants pursuant to Tenn. R. Crim. P. 14 is a matter entrusted to the sound discretion of the trial court. State v. Carruthers, 35 S.W.3d 516, 552 (Tenn. 2000), cert. denied, 533 U.S. 953, 121 S. Ct. 2600 (2001); State v. Howell, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000); State v. Ensley, 956 S.W.2d 502, 508 (Tenn. Crim. App. 1996). Thus, on appeal, this court will not reverse the trial court's ruling unless the defendant was clearly prejudiced in his defense by being jointly tried with his co-defendant. Carruthers, 35 S.W.3d at 552; Howell, 34 S.W.3d at 491; State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988). In other words, "[t]he record must demonstrate that 'the defendant was clearly prejudiced to the point that the trial

-29-

court's discretion ended and the granting of [a] severance became a judicial duty' before an accused is entitled to a reversal of his conviction." Burton, 751 S.W.2d at 447(citation omitted)(alteration in original). In Woodruff v. State, 51 S.W.2d 843, 845 (Tenn. 1932), our supreme court proffered the following oft-repeated explanation:

> It may have been to the interest of each [defendant] that he be tried alone, but the orders of the court are molded to protect rights, and not merely the interests, of persons accused of crime. The State, as well as the persons accused, is entitled to have its rights protected, and when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants.

See also Carruthers, 35 S.W.3d at 552-553; State v. Coleman, 619 S.W.2d 112, 116 (Tenn. 1981); State v. Deborah Graham, No. E1999-02248-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 241, at *36 (Knoxville, March 29, 2001), perm. to appeal denied, (Tenn. 2001).


The above standard echoes that articulated by the United States Supreme Court in applying the federal counterpart to Tenn. R. Crim. P. 14. According to the federal standard, severance of properly joined defendants requires "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539, 113 S. Ct. at 938. A defendant is not prejudiced merely because his chances for acquittal would have been better had he been tried separately. Id. at 540, 113 S. Ct. at 938; see also, e.g., United States v. DeLeon, 187 F.3d 60, 63-64 (1st Cir. 1999); United States v. Welch, 97 F.3d 142, 147-148 (6th Cir. 1996); United States v. Lee, 743 F.2d 1240, 1248 (8th Cir. 1984). Due to the similarities between the state and federal standards, this court has previously drawn upon federal authorities in assessing a trial court's denial of a motion for severance. See, e.g., Carruthers, 35 S.W.3d at 553-554; Ensley, 956 S.W.2d at 509; State v. Alcorn, 741 S.W.2d 135, 140 (Tenn. Crim. App. 1987); Delay v. State, 563 S.W.2d 905, 907 (Tenn. Crim. App. 1977); State v. Clarence Mabry, No. 01C01-9112-CC-00369, 1992 Tenn. Crim. App. LEXIS 535, at **6-7 (Nashville, June 19, 1992); State v. Melvin Alexander, No. 88-290-III, 1990 Tenn. Crim. App. LEXIS 217, at **10-12 (Nashville, March 15, 1990). With these standards in mind, we now turn to address Groseclose's specific allegations of prejudice.


### i. Speedy Trial

Groseclose's first allegation of prejudice is that the trial court's denial of his motion for severance effectively violated his right to a speedy trial. Specifically, Groseclose points to the trial court's continuance of the trial date at Rickman's request. The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and applicable to the states through the Due Process Clause of the Fourteenth Amendment. Barker v. Wingo, 407 U.S. 514, 515, 92 S. Ct. 2182, 2184 (1972); see also Klopfer v. North Carolina, 386 U.S. 213, 223-226, 87 S. Ct. 988, 993-995 (1967). Likewise, the right to a speedy trial is guaranteed by Article 1, Section 9

of the Tennessee Constitution. State v. Simmons, 54 S.W.3d 755, 758 (Tenn. 2001). The Tennessee legislature has codified this constitutional right at Tenn. Code Ann. § 40-14-101 (1997). Moreover, Tenn. R. Crim. P. 48(b) provides for the dismissal of an indictment "if there is unnecessary delay in bringing a defendant to trial."

In Barker, 407 U.S. at 532, 92 S. Ct. at 2193, the United States Supreme Court identified three interests of defendants that the speedy trial right was designed to protect: (1) preventing undue and oppressive pre-trial incarceration; (2) minimizing the anxiety and concern that accompanies public accusation; and (3) limiting the possibility that long delays will impair the accused's ability to defend himself. See also State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997). The Court has also noted, however, that "'[t]he essential ingredient [of the speedy trial right] is orderly expedition and not mere speed.'" United States v. Ewell, 383 U.S. 116, 120, 86 S. Ct. 773, 776 (1966). In other words,

> [a] "speedy trial" . . . means a trial as soon after indictment as the prosecution can, with reasonable diligence, prepare for it, without needless, vexatious, or oppressive delay, having in view, however, its regulation and conduct by fixed rules of law, any delay created by the operation of which rules does not in legal contemplation work prejudice to the constitutional right of the accused.

Arrowsmith v. State, 175 S.W. 545, 547 (Tenn. 1915); State v. Jefferson, 938 S.W.2d 1, 33 (Tenn. Crim. App. 1996), overruled on other grounds by Moore v. Illinois, 434 U.S. 220, 231-232, 98 S. Ct. 458, 466 (1977).

Consistent with the above reflections, the Court in Barker articulated a test for determining when a defendant has been denied his right to a speedy trial, which test requires the balancing of the following four factors: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether the defendant was prejudiced by the delay. 407 U.S. at 530, 92 S. Ct. at 2192. Our supreme court has utilized this test in assessing pre-trial delay regardless of whether a defendant's claim rested on federal or state protections. State v. Bishop, 493 S.W.2d 81, 83-84 (Tenn. 1973); see also Simmons, 54 S.W.3d at 758-759; State v. Baker, 614 S.W.2d 352, 353 (Tenn. 1981). In applying the test in this case, we note that "[t]he balancing of the appropriate factors identified above is more judicial art than science; no calculus exists to tell this court with precision the weights to assign the various factors, nor is it likely that such a calculus could be devised." Look v. Amaral, 725 F.2d 4, 8 (1st Cir. 1984).

Addressing first the length of the delay, we note that it must qualify as "presumptively prejudicial" even to warrant a court's consideration of the remaining factors in the Barker analysis. Barker, 407 U.S. at 530, 92 S. Ct. at 2192; Simmons, 54 S.W.3d at 759; Utley, 956 S.W.2d at 494. Courts have required that delay approach one year in order to qualify as "presumptively prejudicial." Doggett v. United States, 505 U.S. 647, 652 n.1, 112 S. Ct. 2686, 2691 n.1 (1992); Simmons, 54

S.W.3d at 759; Utley, 956 S.W.2d at 494. If the delay crosses the threshold dividing ordinary from "presumptively prejudicial" delay, a reviewing court "must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." Doggett, 505 U.S. at 651-652, 112 S. Ct. at 2690-2691. "The reasonableness of the length of the delay depends upon the complexity and nature of the case, but the presumption that delay has prejudiced the accused intensifies over time." Simmons, 54 S.W.3d at 759.

We emphasize in this case that Groseclose has confined his speedy trial complaint to the context of the trial court's denial of his motion for severance and the consequent continuance of his trial date from September 14, 1998, until January 25, 1999. In other words, Groseclose seemingly concedes on appeal, and explicitly so conceded in the trial court, that the September 14 trial date was consistent with his right to a speedy trial. Even so, an assessment of the constitutional implications of the trial court's continuance of the trial date requires a determination of the point at which Groseclose's right to a speedy trial attached. Cf. Jefferson, 938 S.W.2d at 13 ("The first determination this Court must make is when the delay began and when the delay ended."). In this regard, we disagree with any suggestion by Groseclose in the trial court or in his brief on appeal that the relevant period of delay should be measured from the date of his arrest in 1977.

We acknowledge that, generally speaking, the right to a speedy trial does in fact attach at the time of a defendant's actual arrest or at the time of formal grand jury action, whichever occurs first. Utley, 956 S.W.2d at 493. However, in State v. Adkins, 725 S.W.2d 660, 664 (Tenn. 1987), our supreme court declined to extend the relevant period of delay beyond trial court proceedings to appellate proceedings resulting in the reversal of a defendant's conviction and the remand of his case for a new trial. Cf. Allen v. State, 505 S.W.2d 715, 719 (Tenn. 1974)(holding that a probation revocation proceeding is a continuation of the criminal prosecution for purposes of constitutional speedy trial protections); State v. Joseph Hart, No. 02C01-9902-CC-00075, 1999 Tenn. Crim. App. LEXIS 940, at *9 (Jackson, September 20, 1999)(holding that the constitutional right to a speedy trial necessarily includes the sentencing phase of a criminal prosecution). Rather, the court suggested that delay in the appellate process implicates constitutional due process protections. Adkins, 725 S.W.2d at 664; see also State v. Billy Joe Baggett, No. 01C01-9604-CC-00160, 1997 Tenn. Crim. App. LEXIS 340, at **17-19 (Nashville, April 3, 1997).

The District of Columbia Court of Appeals has provided a particularly cogent explanation of the interplay of speedy trial and due process protections from the time a defendant commits a crime through appellate proceedings resulting in the reversal of a defendant's conviction:

> [I]f we were to graph the overall analysis of the period from the time of the offense to the reversal of the conviction, we would draw a bell-shaped curve, as follows: Any inordinate delay between the offense and arrest (or other accusation) suggests possible prejudice to the defense -- solely a due process concern at the beginning of the curve.

-32-

Once the defendant has been formally accused, however, there are additional concerns -- financial impact, public obloquy, attendant anxiety -- requiring the addition of speedy trial protections that emphasize the length of delay, as such, as well as demonstrable prejudice. After conviction, these pretrial concerns, while still present, must be said to ebb as a constitutional matter, since the conviction is presumptively valid. Because the burden to show error now rests on the defendant, due process alone remains to protect the defendant at the end of the curve, in the event that the time taken to reverse on appeal has jeopardized the fairness of a retrial.

United States v. Alston, 412 A.2d 351, 359 (D.C. Ct. App. 1980); see also, e.g., Harrison v. United States, 392 U.S. 219, 221 n.4, 88 S. Ct. 2008, 2009 n.4 (1968); Ewell, 383 U.S. at 120-121, 86 S. Ct. at 776-777; United States v. Smith, 94 F.3d 204, 206-207 (6th Cir. 1996); Burkett v. Cunningham, 826 F.2d 1208, 1220-1225 (3d Cir. 1987); Sands v. Cunningham, 617 F. Supp. 1551, 1566-1567 (D.N.H. 1985); Lahr v. State, 615 N.E.2d 150, 151-152 (Ind. Ct. App. 1993); State v. Bessey, 328 A.2d 807, 817-818 (Me. 1974); Icgoren v. State, 653 A.2d 972, 978 (Md. Ct. Spec. App. 1995); Commonwealth v. Latimore, 667 N.E.2d 818, 822-823 (Mass. 1996); Duplantis v. State, 708 So.2d 1327, 1334 (Miss. 1998); State v. Kula, 579 N.W.2d 541, 546-547 (Neb. 1998); People v. Cousart, 444 N.E.2d 971, 973 (N.Y. 1982). Significantly, Groseclose does not raise in this appeal a due process challenge to any appellate delay, nor, apparently, did he raise any such challenge in his federal habeas corpus proceedings.

That having been said, we do not mean to suggest that a defendant's conviction of a charged offense permanently extinguishes his constitutional right to a speedy trial for that offense. On the contrary, in State v. Harris, 978 S.W.2d 109, 113 (Tenn. Crim. App. 1997), perm. to appeal denied, (Tenn. 1998), this court indicated that a defendant's right to a speedy trial attaches anew on the date on which his original conviction is reversed following a successful appeal or collateral attack. Cf., e.g., Nickerson v. State, 629 So.2d 60, 61-63 (Ala. Crim. App. 1993); Lahr, 615 N.E.2d at 151-152; Icgoren, 653 A.2d at 978; Duplantis, 708 So.2d at 1334; Cousart, 444 N.E.2d at 973 n.*.[9] Thus, the relevant period of delay in this case began on July 28, 1995, the date on which the United States District Court for the Middle District of Tennessee reversed Groseclose's conviction and sentence, and concluded on January 25, 1999, the date on which the voir dire of prospective jurors commenced in Groseclose's retrial. Cf., e.g., United States v. Richmond, 735 F.2d 208, 211 (6th Cir. 1984)(observing that, for purposes of the federal Speedy Trial Act, a jury trial commences at voir dire unless the record reflects an intent by the trial court to "'evade the Act's spirit by commencing voir dire within the prescribed time limits and then taking a prolonged recess before

---

[9]In Pelletier v. Warden, 627 A.2d 1363, 1371-1372 (Conn. Ct. App. 1993), the Connecticut court suggested that the time between a defendant's arrest and the reversal of his first conviction might be considered in determining whether he was granted a speedy retrial if the trial error necessitating the retrial occurred for the purpose of delay. See also Kula, 579 N.W.2d at 546-547. Since the appellant makes no such allegation in this case, we need neither adopt nor reject the Connecticut court's suggestion.

the jury is sworn and testimony is begun'"). In other words, the relevant period of delay amounts to approximately three-and-one-half years, a period of delay sufficient to trigger this court's consideration of the remaining factors in Barker. Cf., e.g., Simmons, 54 S.W.3d at 759. Indeed, our assessment of the reasonableness of this delay cannot be divorced from our consideration of the remaining factors.

Our supreme court has previously listed four categories into which reasons for a delay might fall for purposes of a defendant's speedy trial right: (1) intentional delay by the State to gain a tactical advantage over the defense or delay designed to harass the defendant; (2) delay resulting from bureaucratic indifference or negligence; (3) delay necessary to the fair and effective prosecution of the case; and (4) delay caused, or acquiesced in, by the defendant. State v. Wood, 924 S.W.2d 342, 346-347 (Tenn. 1996); cf. State v. Wallace, 648 S.W.2d 264, 269 (Tenn. Crim. App. 1980). Our supreme court also explained the manner in which a court should weigh the different categories of delay in conducting a Barker analysis:

> The first type, intentional delay, is weighed heavily against the State. The second type, negligent delay, is also weighed against the State although not as heavily as deliberate delay. The third type of delay is, by definition, justifiable and is not weighed against either party. The fourth type of delay, which is caused or acquiesced in by the defendant, is weighed against the defendant.

Wood, 924 S.W.2d at 347. We note that, "[b]ecause 'the prosecutor and the court have an affirmative constitutional obligation to try the defendant in a timely manner . . . the burden is on the prosecution to explain the cause of the pre-trial delay.'" United States v. Brown, 169 F.3d 344, 349 (6th Cir. 1999)(alteration in original); see also Barker, 407 U.S. at 531, 92 S. Ct. at 2192 (characterizing the second factor of the speedy trial analysis as the "reason the government assigns to justify the delay"); Hakeem v. Beyer, 990 F.2d 750, 770 (3d Cir. 1993)(noting that, "once a delay is alleged and rises to the point where a Barker inquiry has commenced, the state . . . bears the burden to justify the delay"); Terry v. Duckworth, 715 F.2d 1217, 1220 (7th Cir. 1983)(observing that, "[a]bsent any direct evidence on this point, we cannot presume either a deliberate attempt on the part of the state to hamper the defense or a valid justification for the delay"); Morris v. Wyrick, 516 F.2d 1387, 1390 (8th Cir. 1975)(observing that, when the record does not reflect any reason for delay, this factor will be weighed against the State); State v. Nance, 521 S.W.2d 814, 817-818 (Tenn. 1975)(noting that, "in speedy trial issues, the burden of proof may well rest upon the State on appeal to explain or justify a delay").

In this case, most of the delay, from July 28, 1995, until May 18, 1998, was occasioned by the State's decision to appeal the district court's order granting Groseclose relief. In Harris, 978 S.W.2d at 113, we analogized delay occasioned by the State's appeal of a trial court's grant of post-conviction relief to delay occasioned by a State's interlocutory appeal and cited with approval the following observation by the United States Supreme Court in United States v. Loud Hawk, 474 U.S. 302, 315-316, 106 S. Ct. 648, 656 (1986)(citations omitted):

> [I]t hardly need be said that an . . . appeal by the Government ordinarily is a valid reason that justifies delay. In assessing the purpose and reasonableness of such an appeal, courts may consider several factors. These include the strength of the Government's position on the appealed issue, the importance of the issue in the posture of the case, and - - in some cases - - the seriousness of the crime. For example, a delay resulting from an appeal would weigh heavily against the Government if the issue were clearly tangential or frivolous. Moreover, the charged offense usually must be sufficiently serious to justify restraints that may be imposed on the defendant pending the outcome of the appeal.

See also, e.g., People v. Crane, 743 N.E.2d 555, 563-564 (Ill. 2001); People v. James, 460 N.W.2d 557 (Mich. 1990).

The pivotal issue on appeal in this case was ineffective assistance of counsel. As in Harris, 978 S.W.2d at 114, "the importance of the issue in the posture of the case was profound: unless it successfully appealed, the State lost a conviction of . . . first-degree murder and faced the unhappy prospect of having to try the defendant a second time. Likewise, the seriousness of the crime was extreme." In fact, we can conceive of no more serious crime than that committed by Groseclose. As to the strength of the State's position on appeal, we need look no farther than Judge Suhrheinrich's vigorous dissent from the decision by the United States Court of Appeals for the Sixth Circuit affirming the district court's grant of habeas corpus relief. Groseclose v. Bell, 130 F.3d 1161, 1171-1179 (6th Cir. 1997). In short, the delay from July 28, 1995, until May 18, 1998, was fully justified.

The remaining delay in Groseclose's case spanned approximately eight months, from May 18, 1998, until January 25, 1999. While "[i]t is impossible to assign 'fault' for . . . delays with mathematical precision," United States v. Jones, 524 F.2d 834, 850 (D.C. Cir. 1975), the record reflects that one month of this delay was consumed by the State's issuance of capiases, the trial court's arraignment of the appellants, and the court's search for and appointment of counsel. Nothing in the record suggests, and the appellant does not allege, any intentional delay by the State during these preliminary proceedings or, alternatively, bureaucratic indifference or negligence. Moreover, to the extent any delay in arraigning the appellants or appointing counsel was attributable to the scheduling demands of the court's docket, this more "neutral" reason for the delay weighs minimally against the State and in favor of Groseclose's speedy trial claim.

A review of the record also reveals, and Groseclose effectively concedes, that the three-month delay following the appointment of counsel and prior to the original trial date resulted from both the State's and Groseclose's diligent efforts to piece together once more an almost twenty-two-year-old capital case and the trial court's need to resolve the approximately thirty pre-trial motions filed by counsel, some of which motions required evidentiary hearings and the entry of

-35-

written findings of fact and conclusions of law. In this regard, we note the following remarks of the trial court in its April 22, 1999 Supplemental Order, granting Groseclose additional funds for investigative services:

> The case of State of Tennessee v. William Groseclose was a complex and hotly contested trial in which the State of Tennessee was seeking the Death Penalty. The Defense was initially provided with a list of over one hundred witness[es], many of whom had to be found after a twenty-two year period. Additionally, there were numerous new witnesses that were found in various states across the country. There was a large number of pre-trial motions that were filed pre-trial and arguments were heard. The trial . . . lasted three and a half weeks.

Similarly, the trial court's four-month continuance of the joint proceedings at Rickman's request was fully justifiable, and we will not weigh the delay against either party. See, e.g., State v. Wilcoxson, 772 S.W.2d 33, 36 (Tenn. 1989); State v. Moore, 713 S.W.2d 670, 675 (Tenn. Crim. App. 1985); cf. United States v. Davenport, 935 F.2d 1223, 1239-1240 (11th Cir. 1991); United States v. Becker, 585 F.2d 703, 708 (4th Cir. 1978); United States v. Noriega, 746 F. Supp. 1548, 1558-1562 (S.D. Fla. 1990). Like a trial court's grant or denial of a motion for severance under Tenn. R. Crim. P. 14, a trial court's grant or denial of a motion for a continuance rests within its sound discretion and does not constitute an abuse of that discretion absent prejudice to the complaining party. State v. Goodman, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982). Not only, as we subsequently conclude, has the appellant failed to make any affirmative showing of prejudice stemming from the trial court's four-month continuance, but also the record supports the trial court's determination that a continuance was necessary to assure the right of Groseclose's co-defendant to the effective assistance of counsel. Notwithstanding Groseclose's motion for severance and the State's opposition thereto, the record is devoid of any evidence or suggestion that the State pursued its right to a joint trial of the appellants in bad faith, i.e., for the purpose of delaying Groseclose's trial, or that its pursuit of a joint trial was otherwise unnecessary to a fair and effective prosecution of the case.

Having concluded that the reasons for the delay do not weigh materially in favor of Groseclose's speedy trial claim, we note that a defendant's assertion of his right to a speedy trial "is entitled to strong weight in favor of the defendant, while failure to assert the right [to a speedy trial] ordinarily will make it difficult to prove that the right has been denied." Simmons, 54 S.W.3d at 760. In this case, Groseclose asserted his right to a speedy trial on August 3, 1998, but, as noted previously, limited his demand to the September 14, 1998 trial date, thereby indicating his satisfaction with the pace of the litigation through that date. In summary, the timing of Groseclose's assertion of his speedy trial right underscores the focus of his complaint upon the four-month delay

following the original trial date while simultaneously undercutting the strength of his speedy trial complaint as a whole.[10]

Finally, we address whether Groseclose was prejudiced by the three-and-one-half-year delay preceding his retrial. In light of the confusion evident in Groseclose's brief on appeal, we must emphasize that, while the joinder of defendants may result in pre-trial delay that in turn violates a defendant's right to a speedy trial, not all prejudice stemming from the joinder of defendants is thereby relevant to the speedy trial claim. For example, whether Groseclose "was forced to trial with a Co-Defendant who had a different defense" is irrelevant to the interests that the speedy trial right was designed to protect, Barker, 407 U.S. at 532, 92 S. Ct. at 2193, albeit mutually antagonistic defenses may otherwise support severance of defendants, see, e.g., United States v. Pena-Lora, 225 F.3d 17, 34 (1st Cir. 2000); United States v. Tootick, 952 F.2d 1078, 1081 (9th Cir. 1991); United States v. Guerrero, 938 F.2d 725, 727-728 (7th Cir. 1991).

In short, Groseclose does not allege any prejudice stemming from the three-and-one-half-year delay itself as opposed to the joinder of defendants. For example, he does not contend that his defense was impaired by the delay because any witness was unavailable or unable accurately to recall the events in question or because any exculpatory evidence was lost or unavailable.[11] Barker, 407 U.S. at 532, 92 S. Ct. at 2193. Of course,

> prejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings. Inordinate delay . . . "may 'seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.' These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty."

---

[10]During the pendency of the State's appeals before the United States Supreme Court, both Groseclose and Rickman filed motions in the United States District Court requesting the issuance of the writ of habeas corpus in their cases due to the failure by the State to try the appellants within 120 days of the issuance of the mandate by the United States Court of Appeals for the Sixth Circuit affirming the district court's reversal of their convictions and sentences. In particular, the appellants relied upon the State's failure to request a stay of the mandate pending the Supreme Court's resolution of its petition for writ of certiorari. Apparently, neither appellant claimed a violation of his right to a speedy trial, and, indeed, the district court noted in its order denying the appellants' motions that the appellants' right to a speedy trial would not be implicated were they to be retried.

[11]We emphasize that, even assuming that Mount would have provided exculpatory testimony, his suicide occurred prior to the period of delay at issue in this case.

Moore v. Arizona, 414 U.S. 25, 26-27, 94 S. Ct. 188, 190 (1973)(footnote and citation omitted)(alteration in original). In Groseclose's case, however, to ascribe prejudice of the type described above solely to the three-and-one-half-year delay at issue is to ignore the preceding eighteen years. Moreover, without a more specific showing by Groseclose, any additional prejudice occasioned by the three-and-one-half-year delay does not weigh heavily in favor of his speedy trial claim.

For example, Groseclose does not contend that he was subjected to any greater degree of anxiety than that normally attendant to a retrial in which the State is charging first degree murder and seeking the death penalty. Cf. Hakeem, 990 F.2d at 762 (observing that "a defendant must show that his anxiety extended beyond that which 'is inevitable in a criminal case'"); Morris, 516 F.2d at 1391 (observing that "[a]nxiety and concern of the accused are undoubtedly present to some degree in every case"); United States v. Shepherd, 511 F.2d 119, 123 (5th Cir. 1975) (recognizing that prejudice from anxiety requires "more than the normal anxiety that accompanies a trial"). Similarly, although Groseclose was incarcerated during the three-and-one-half-year delay, "credit for time served 'mitigates the potential oppressive effects of . . . incarceration.'" Hakeem, 990 F.2d at 762 (citation omitted). In this case, Groseclose is entitled to "credit on [his] sentence for any period of time for which [he] was committed and held in the . . . county jail . . . pending arraignment and trial . . . [and] for the time served in the . . . penitentiary subsequent to any conviction arising out of the original offense for which the defendant was tried." Tenn. Code Ann. § 40-23-101(c) (1997); see also Marsh v. Henderson, 424 S.W.2d 193, 195 (Tenn. 1968); Stubbs v. State, 393 S.W.2d 150, 154 (Tenn. 1965).

Concededly, a defendant need not necessarily present affirmative proof of prejudice in order to establish a speedy trial claim. Simmons, 54 S.W.3d at 760 (citing Doggett, 505 U.S. at 655-656, 112 S. Ct. at 2692-2693). Nevertheless, presumptive prejudice cannot alone carry a speedy trial claim without regard to the other Barker criteria. Doggett, 505 U.S. at 655-656, 112 S. Ct. at 2693. In other words, "such prejudice 'unenhanced by tangible impairment of the defense function and unsupported by a better showing on the other factors than was made here, does not alone make out a deprivation of the right to . . . speedy trial.'" United States v. Jackson, 542 F.2d 403, 409 (7th Cir. 1976)(citing United States v. De Tienne, 468 F.2d 151, 158 (7th Cir. 1972)); see also Wilson v. Mitchell, 250 F.3d 388, 394-396 (6th Cir. 2001)(noting that the reason for delay determines the amount of proof that a petitioner must proffer in order to show prejudice); Cowart v. Hargett, 16 F.3d 642, 647 (5th Cir. 1994)(noting that, since the first three factors of the Barker analysis did not weigh heavily against the State, the defendant was required to make an affirmative showing of prejudice).

In summary, the length of the delay in this case crossed well beyond the threshold dividing ordinary from "presumptively prejudicial" delay. Doggett, 505 U.S. at 651-652, 112 S. Ct. at 2690-2691. However, the delay was almost entirely, if not fully, justified, and, indeed, Groseclose was apparently untroubled by any deprivation of his right to a speedy trial until the final four months of the relevant period. Under these circumstances, Groseclose was required to present affirmative

-38-

proof that he was prejudiced by the delay. In the absence of such proof, we cannot conclude that a deprivation of Groseclose's right to a speedy trial required the severance of his case from that of Rickman.

### ii. **Bruton**

Groseclose's second allegation of prejudice is that the trial court allowed the introduction at the appellants' joint trial of Ronald Casper's testimony in violation of his right to confrontation and, more specifically, the United States Supreme Court's decision in Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620 (1968). Again, Casper testified that, following the discovery of Deborah's body by the police, he overheard appellant Rickman make several telephone calls in which he asked to speak with "Bill" or "Bill Groseclose." The trial court permitted the State to introduce this testimony against Rickman pursuant to Tenn. R. Evid. 803(1.2), as an admission of a party-opponent. However, due to Rickman's exercise of his constitutional privilege against self-incrimination, the trial court provided to the jury the following limiting instruction both during Casper's testimony and at the conclusion of Casper's testimony:

> Members of the jury, the court instructs you that this statement is being offered to you with regard to these phone calls or attempted phone calls. It's being offered to you, and you are only allowed to consider it as it applies to the guilt or innocence of Ron Rickman. You cannot use this information, in any regard, as to the guilt or innocence of Bill Groseclose.

The trial court reiterated in its main jury instructions that "[a]ny evidence which was limited to a particular defendant should not be considered by you as to any other defendant." Notwithstanding these instructions, the court conceded to counsel its doubt about its decision to allow the introduction of Casper's testimony into evidence.

The Sixth Amendment to the United States Constitution guarantees an accused in a criminal prosecution the right "to be confronted with the witnesses against him," which guarantee binds the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403, 85 S. Ct. 1065, 1068 (1965). Moreover, Article I, Section 9 of the Tennessee Constitution affords an accused the right "to meet the witnesses face to face." State v. Williams, 913 S.W.2d 462, 465 (Tenn. 1996); State v. Kennedy, 7 S.W.3d 58, 64 (Tenn. Crim. App. 1999). Notably, although the two provisions are not identical, our supreme court has previously adopted the standards of the United States Supreme Court under the Confrontation Clause of the Sixth Amendment to the United States Constitution in determining whether there has been a violation of an accused's right to confrontation under Article I, Section 9 of the Tennessee Constitution. State v. Middlebrooks, 840 S.W.2d 317, 332 (Tenn. 1992); State v. Causby, 706 S.W.2d 628, 631 (Tenn. 1986); State v. Armes, 607 S.W.2d 234, 236 (Tenn. 1980). But cf. State v. Deuter, 839 S.W.2d 391, 396 (Tenn. 1992)(acknowledging that, in other states, the "face-to-face" language has been held to impose a higher right than that found in the federal constitution but noting that "the extent to which our constitution exceeds the protection provided by the federal constitution need not be decided in this case").

Certainly, whether derived from the federal or state constitution, the right of an accused in a criminal trial to confront any witness against him "'is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal'" inasmuch as it promotes reliability by

> "(1) insur[ing] that the witness will give his statements under oath - - thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forc[ing] the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permit[ting] the jury that is to decide the defendant's fate to observe the demeanor of the witness making his statement, thus aiding the jury in assessing his credibility."

Lee v. Illinois, 476 U.S. 530, 540, 106 S. Ct. 2056, 2062 (1986); see also State v. Hughes, 713 S.W.2d 58, 60 (Tenn. 1986); Kennedy, 7 S.W.3d at 64. Nevertheless, competing interests, including every State's "strong interest in effective law enforcement, and in the development and precise formulation of the rules of evidence applicable in criminal proceedings," may warrant dispensing with confrontation at trial. Ohio v. Roberts, 448 U.S. 56, 64, 100 S. Ct. 2531, 2538 (1980); see also Kennedy, 7 S.W.3d at 64-65.


Of particular relevance to the instant case is the impact of the constitutional right to confrontation upon evidentiary rules governing the admission of hearsay statements. Clearly, the constitutional right to confrontation does not bar the admission against a criminally accused of all statements defined as hearsay by federal or state rules. Maryland v. Craig, 497 U.S. 836, 847-848, 110 S. Ct. 3157, 3164-6165 (1990); State v. Henderson, 554 S.W.2d 117, 118-119 (Tenn. 1977). Indeed, the admission of an accused's own hearsay statements cannot logically implicate his right to confrontation. Also, the admission of another's hearsay statements generally does not implicate an accused's right to confrontation if the declarant testifies at trial and is subject to cross-examination. California v. Green, 399 U.S. 149, 158-164, 90 S. Ct. 1930, 1935-1938 (1970); see also, e.g., Richardson v. Marsh, 481 U.S. 200, 206, 107 S. Ct. 1702, 1707 (1987). Even when a declarant does not testify at trial, "certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the 'substance of the constitutional protection'" of confrontation. Roberts, 448 U.S. at 66, 100 S. Ct. at 2539; see also, e.g., Lilly v. Virginia, 527 U.S. 116, 126, 119 S. Ct. 1887, 1894-1895 (1999)(plurality opinion); White v. Illinois, 502 U.S. 346, 356-357, 112 S. Ct. 736, 743 (1992); Bourjaily v. United States, 483 U.S. 171, 182-184, 107 S. Ct. 2775, 2782-2783 (1987); Causby, 706 S.W.2d at 631; State v. Alley, 968 S.W.2d 314, 317 (Tenn. Crim. App. 1997). Otherwise, the extrajudicial statements of a non-testifying declarant must bear their own "'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability." Lilly, 527 U.S. at 125, 119 S. Ct. at 1894 (plurality opinion); see also Roberts, 448 U.S. at 66, 100 S. Ct. at 2539; see generally Kennedy, 7 S.W.3d at 64-66, and cases cited therein.

Courts have been especially troubled by the interplay of the constitutional right to confrontation with a specific category of hearsay evidence comprising accomplices' confessions that inculpate a criminal defendant. In particular, the United States Supreme Court has observed that, due to an accomplice's strong motivation to exonerate himself and incriminate his companion, the accomplice's extrajudicial confession is even less reliable than ordinary hearsay evidence and, therefore, uniquely threatens the interests protected by a defendant's right to confrontation when introduced against the defendant without the benefit of cross-examination. Lee, 476 U.S. at 541, 106 S. Ct. at 2062. More recently and more explicitly, a plurality of the Court categorically concluded that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence," albeit the Court conceded that such hearsay statements may possess their own particularized guarantees of trustworthiness. Lilly, 527 U.S. at 134 & 134 n.5, 119 S. Ct. at 1899 & 1899 n.5.

The Court's ruling in Bruton, 391 U.S. at 137, 88 S. Ct. at 1628, upon which appellant Groseclose relies in this case, "illustrates the extent of the Court's concern that the admission of [accomplices' extrajudicial confessions that inculpate a criminal defendant] will distort the truthfinding process," Lee, 476 U.S. at 542, 106 S. Ct. at 2063. In Bruton, 391 U.S. at 137, 88 S. Ct. at 1628, the Court rejected even the notion that, in a joint trial, any encroachment on the nondeclarant's right to confrontation can be avoided by the trial court's instruction to the jury that it should disregard the confessor's extrajudicial statement inculpating the nondeclarant in determining the latter's guilt or innocence. While acknowledging the general presumption that a jury can and will comply with a trial court's instructions limiting the jury's consideration of evidence adduced at trial, the Court concluded that the risk of noncompliance was too great in the context of "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant." Id. at 135-136, 88 S. Ct. at 1627-1628.

In invoking Bruton in this case, Groseclose seeks to equate Casper's account to the jury of Rickman's attempts to telephone Groseclose with the hearsay evidence at issue in Bruton. However, as noted by the State, Rickman's statements were not "confessions" made under circumstances in which he possessed a strong motivation to exonerate himself and incriminate Groseclose. Cf., e.g., Vincent v. Parke, 942 F.2d 989, 991 (6th Cir. 1991). More importantly, perhaps, Rickman's statements did not on their face incriminate Groseclose. The United States Supreme Court has expressly declined to apply Bruton even to an accomplice's confession when it did not incriminate the defendant without reference to other, admissible evidence. Marsh, 481 U.S. at 208-211, 107 S. Ct. at 1707-1709; see also, e.g., United States v. Rahseparian, 231 F.3d 1267, 1277-1278 (10th Cir. 2000), cert. denied, 532 U.S. 974, 121 S. Ct. 1609 (2001); United States v. Lage, 183 F.3d 374, 386 (5th Cir. 1999); Vincent, 942 F.2d 989, 991; State v. Person, 781 S.W.2d 868, 872-873 (Tenn. Crim. App. 1989); State v. Thomas J. Faulkner, Jr., No. E2000-00309-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 293, at **34-35 (Knoxville, April 17, 2001), perm. to appeal denied, (Tenn. 2001); cf. Gray v. Maryland, 523 U.S. 185, 192, 118 S. Ct. 1151, 1155 (1998).

That having been said, we acknowledge that the relevance of the disputed statements to Rickman's guilt depended upon the jury's finding of Groseclose's guilt. In other words, Rickman's attempts to telephone Groseclose following the discovery of Deborah's body only incriminated Rickman if Groseclose participated in the murder. Under these circumstances, the trial court's limiting instructions may not have adequately addressed the temptation presented to the jury to engage in circular reasoning by which it inferred Rickman's guilt from his attempts to call Groseclose and Groseclose's guilt from Rickman's. However, Rickman's attempts to call Groseclose did not occur in a vacuum. In other words, the State adduced abundant other evidence at trial with which the jury could find both Rickman's and Groseclose's guilt. Thus, even assuming the applicability of Bruton, any deficiency in the trial court's limiting instruction was harmless. Harrington v. California, 395 U.S. 250, 254, 89 S. Ct. 1726, 1728-1729 (1969); United States v. Davis, 418 F.2d 59, 62-63 (9th Cir 1969); cf. United States v. Wingate, 520 F.2d 309, 313 (2d Cir. 1975); Gant v. State, 466 S.W.2d 518, 523-524 (Tenn. Crim. App. 1969).

We also note that the United States Supreme Court has declined to find a violation of a defendant's right to confrontation when a non-testifying accomplice's confession did not constitute "hearsay." Tennessee v. Street, 471 U.S. 409, 417, 105 S. Ct. 2078, 2083 (1985); see also State v. Stephenson, 878 S.W.2d 530, 549 (Tenn. 1994); State v. Price, 46 S.W.3d 785, 803-804 (Tenn. Crim. App. 2000), perm. to appeal denied, (Tenn. 2001). In the instant case, it is not at first glance apparent that Rickman's requests to speak with "Bill" or "Bill Groseclose" constitute hearsay. Tenn. R. Evid. 801(c)[12] defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(a) defines a "statement," in relevant part, as "an oral or written assertion." These definitions restate Tennessee common law, see Tenn. R. Evid. 801, Advisory Commission Comments, and are largely identical to those set forth in the Federal Rules of Evidence and the rules

---

[12]The Tennessee Rules of Evidence were only adopted in 1990, well after the appellants' offenses. Nevertheless, the Compiler's Notes state:

> These rules, which were contingent upon approval by both houses of the general assembly, were ratified and approved in 1989 House Resolution 10 and Senate Resolution 4.
>
> The January 23, 1989 order adopting these rules provided that they take effect January 1, 1990 and be applicable to all cases tried from and after that date. The order also provided that the rules "govern evidence rulings in all trial courts of the state except as otherwise provided by statute or rules of this court."

Consistent with the January 23, 1989 order, the transcript of the appellants' trial reflects the trial court's application of the rules of evidence as they existed at the time of the appellants' trial. For purposes of subsequent analysis, we note that neither appellant asserts anywhere in his brief that significant changes in the law of evidence between the time of his offense and the time of trial implicated ex post facto provisions of the United States or Tennessee constitutions. Moreover, we note generally "that laws which change a rule of evidence, but which do not increase the punishment nor change the elements of the offense or the ultimate facts necessary to establish guilt, but only remove existing restrictions on the competency of certain classes of evidence or of persons as witnesses do not constitute ex post facto laws." State v. Pike, 978 S.W.2d 904, 926 (Tenn. 1998); see also Carmell v. Texas, 529 U.S. 513, 521-552, 120 S. Ct. 1620, 1626-1643 (2000).

of evidence in most states, 2 Kenneth S. Broun et al., <u>McCormick on Evidence</u> § 246, at 96 (John W. Strong ed.,1999). According to these definitions, questions or requests generally do not constitute hearsay. <u>State v. Mathis</u>, 702 S.W.2d 179, 181-182 (Tenn. Crim. App. 1985); <u>State v. Darrow Lynn Williams</u>, No. W2001-01825-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 943, at *6 n.1 (Jackson, November 29, 2001), <u>perm. to appeal denied</u>, (Tenn. 2002); Neil P. Cohen et al., <u>Tennessee Law of Evidence</u> § 8.01(10), at 8-22 (LEXIS Law Publishing 4th ed. 2000).

Still, we have previously observed that questions or requests may constitute hearsay if they contain implicit assertions. <u>Williams</u>, No. W2001-01825-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 943, at *6 n.1; <u>see also</u> Neil P. Cohen et al., <u>supra</u>, at 8-22 n.34. Federal courts have more narrowly held that the question or inquiry must be <u>intended</u> as an assertion. <u>See, e.g.</u>, <u>United States v. Jackson</u>, 88 F.3d 845, 848 (10th Cir. 1996); <u>United States v. Long</u>, 905 F.2d 1572, 1580 (D.C. Cir. 1990); <u>United States v. Lewis</u>, 902 F.2d 1176, 1179 (5th Cir. 1990); <u>see generally</u> <u>Ex parte Hunt</u>, 744 So. 2d 851, 856-858 (Ala. 1999)(discussing a "split of authority" as to whether a question is a "statement" as defined by the hearsay rule). Regardless, by inquiring if he could speak with "Bill" or "Bill Groseclose," Rickman clearly intended to assert his desire to speak with Groseclose. <u>Cf.</u> <u>Jackson</u>, 88 F.3d at 848 ("The question, 'Is this Kenny?' cannot reasonably be construed to be an intended assertion, either express or implied."). Moreover, the State clearly sought to introduce Rickman's "statements" to prove the truth of the matter asserted as the prosecutor remarked that the evidence was "being submitted to show that Ron Rickman attempted to contact Bill Groseclose."

More significantly, the Supreme Court emphasized in <u>Bruton</u>, 391 U.S. at 128 n.3, 88 S. Ct. at 1623 n.3 (citations omitted), that "the hearsay statement . . . [at issue] was clearly inadmissible . . . under traditional rules of evidence . . . . There is not before us, therefore, any recognized exception to the hearsay rule insofar as [the defendant] is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause." Unlike the hearsay statement in <u>Bruton</u>, Rickman's statements satisfy Tennessee's co-conspirator exception to the hearsay rule. Our conclusion in this regard requires a review of the requirements of Tenn. R. Evid. 803(1.2)(E). Under that rule, the proponent of a hearsay statement must establish by a preponderance of the evidence (1) that a conspiracy existed and the declarant and the defendant were participants in the conspiracy; (2) that the statement was made during the course of the conspiracy; and 3) that the statement was made in furtherance of the conspiracy. <u>State v. Henry</u>, 33 S.W.3d 797, 801-802 (Tenn. 2000). The evidence used to establish the first prerequisite, i.e., the existence of the conspiracy and the connection of the declarant and the defendant thereto, must be independent of the hearsay statement itself. <u>State v. Hutchison</u>, 898 S.W.2d 161, 169 (Tenn. 1994). Otherwise, the court may consider all the evidence before it, whether admissible at trial or not, in resolving these preliminary factual questions. Tenn. R. Evid. 104(a); <u>cf. also</u> <u>United States v. Shores</u>, 33 F.3d 438, 442 (4th Cir. 1994).

Within the context of the co-conspirator exception to the hearsay rule, our supreme court has defined a conspiracy as "a combination between two or more persons to do a criminal or unlawful act or a lawful act by criminal or unlawful means." <u>State v. Carruthers</u>, 35 S.W.3d 516,

555 (Tenn. 2000), cert. denied, 533 U.S. 953, 121 S. Ct. 2600 (2001); see also Alley, 968 S.W.2d at 316; State v. Lequire, 634 S.W.2d 608, 612 (Tenn. Crim. App. 1982).[13]  Moreover, it has long been held that, for purposes of establishing the existence of a conspiracy within the meaning of the co-conspirator exception, it is irrelevant whether or not the participants were formally charged with conspiracy.  Lequire, 634 S.W.2d at 612 n.1; see also Alley, 968 S.W.2d at 316.  In this case, evidence independent of the disputed hearsay statements overwhelmingly established Groseclose's and Rickman's participation in a conspiracy to murder Deborah Groseclose and thereby obtain the proceeds of insurance policies on her life.

Of course, Rickman's statements occurred following the murder.  In Henry, 33 S.W.3d at 803 (citing State v. Walker, 910 S.W.2d 381, 385-386 (Tenn. 1995))(footnote omitted), our supreme court observed that

> [t]he commission of the offense that was the goal of the conspiracy does not necessarily end the conspiracy, nor does it preclude the possibility that the conspiracy encompassed later statements regarding concealment of the offense.  At the same time, the commission of the offense also does not imply that the conspiracy automatically included all later statements pertaining to the concealment of the offense.

The court affirmed that the duration of the conspiracy is dependent on the facts of each case, citing with approval the Minnesota Supreme Court's adoption of the federal standard set forth in United States v. Mackey, 571 F.2d 376, 383 (7th Cir. 1978).  Henry, 33 S.W.3d at 803 (citing State v. Buschkopf, 373 N.W.2d 756, 764 (Minn. 1985)); see also State v. Michael Bikrev, No. M2001-01620-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 91, at **15-16 (Nashville, February 4, 2002).

Moreover, in the specific context of a conspiracy to commit a murder for the purpose of acquiring the proceeds of insurance policies on the victim's life, our supreme court has held that the "conspiracy continues until the conspirators' ultimate goal of collecting the proceeds of the crime has been achieved or abandoned."  Hutchison, 898 S.W.2d at 170; see also State v. Gaylor, 862 S.W.2d 546, 554 (Tenn. Crim. App. 1992).  Analogously, in United States v. Howard, 770 F.2d 57, 61 (6th Cir. 1985), the United States Court of Appeals for the Sixth Circuit observed that, in the

---

[13]In State v. Walker, 910 S.W.2d 381, 384-385 (Tenn. 1995), and id. at 403 (Reid, J., concurring and dissenting), our supreme court seemingly suggested that the definition of a conspiracy for purposes of the co-conspirator exception to the hearsay rule is controlled by the substantive law of conspiracy in effect at the time of the statements.  Subsequently, however, this court in State v. Gerald Leander Henry, No. 01C01-9505-CR-00161, 1999 Tenn. Crim. App. LEXIS 167, at **55-58 (Nashville, February 25, 1999), cast doubt upon this interpretation of the Walker decision, noting that the court's "recognition of the evidentiary rule reflects that the rule will control on the issue of admissibility of hearsay statements."  Moreover, in Henry, 33 S.W.3d at 802 n.3 & 803 n.4, the supreme court approved our reading of the Walker decision in this respect, rejecting the proposition that the evidentiary rule is controlled by the statutory offense of conspiracy.  That having been said, the potentially applicable statute in Henry explicitly disclaimed any intent to modify the evidentiary rule.  See Tenn. Code Ann. § 39-12-103(g) (1997).  Nevertheless, the supreme court did not appear to rely solely upon this disclaimer in affirming the independence of the evidentiary rule from the substantive law of conspiracy.

context of the defendants' conspiracy to commit arson for the purpose of acquiring insurance proceeds, the conspiracy continued until the collection of the insurance proceeds, "a main objective [that] ha[d] not been attained or abandoned." Cf. also Grunewald v. United States, 353 U.S. 391, 405, 77 S. Ct. 963, 974 (1957)(distinguishing for purposes of the federal co-conspirator exception between "acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime"). At the time of Rickman's statements in this case, Groseclose had not yet obtained the proceeds of insurance policies on Deborah's life, and Rickman's receipt of the second installment on the murder contract depended upon Groseclose's success in obtaining those proceeds. In other words, the common goal or objective of the conspiracy was still in existence at the time of the statements, nor do we believe that Rickman's flight to Oklahoma, without more, reflected an intent to abandon the common goal or objective.

Finally,

"[a] statement may be in furtherance of the conspiracy in countless ways. Examples include statements designed to get the scheme started, develop plans, arrange for things to be done to accomplish the goal, update other conspirators on the progress, deal with arising problems, and provide information relevant to the project."

Carruthers, 35 S.W.3d at 556. At the time of Rickman's statements, he was clearly attempting to "deal with arising problems" as the police had discovered Deborah's body thereby increasing the danger of the appellants' apprehension and the frustration of the appellants' ultimate goal of collecting the insurance proceeds. Conversely, the discovery of Deborah's body potentially brought the appellants closer to the attainment of their ultimate goal, and Rickman certainly possessed an interest in monitoring the progress of any insurance claims filed by Groseclose. Indeed, Rickman later confessed to police that his primary purpose in attempting to contact Groseclose was to discuss payment of the outstanding balance on the murder contract, i.e., the attainment of the remaining objective of the conspiracy. Tenn. R. Evid. 104(a); Shores, 33 F.3d at 444.

Not only do Rickman's statements satisfy Tennessee's co-conspirator exception to the hearsay rule, but Tennessee's co-conspirator exception is firmly rooted for purposes of the right to confrontation guaranteed by both the United States and Tennessee constitutions. In this regard, we first note that whether statements fall within a firmly rooted hearsay exception for purposes of the Confrontation Clause of the Sixth Amendment to the United States Constitution is a question of federal law. Lilly, 527 U.S. at 125, 119 S. Ct. at 1894 (plurality opinion). Again, in Lilly, id. at 134, 119 S. Ct. at 1899, a plurality of the United States Supreme Court concluded that accomplices' confessions that inculpate a criminal defendant do not fall within such an exception. However, the plurality qualified its conclusion by acknowledging that "any inherent unreliability that accompanies co-conspirator statements made during the course and in furtherance of the conspiracy is per se rebutted by the circumstances giving rise to the long history of admitting such statements." Id. at 137, 119 S. Ct. at 1900. Indeed, in Bourjaily, 483 U.S. at 182, 107 S. Ct. at 2782, the Court held that

-45-

the requirements of the federal co-conspirator exception are identical to the requirements of the Sixth Amendment's Confrontation Clause. See also United States v. Inadi, 475 U.S. 387, 400, 106 S. Ct. 1121, 1128-1129 (1986); United States v. Molina, 75 F.3d 600, 603 (10th Cir. 1996); Shores, 33 F.3d at 442; United States v. Saks, 964 F.2d 1514, 1525 (5th Cir. 1992); United States v. Coco, 926 F.2d 759, 761 (8th Cir. 1991); cf. Dutton v. Evans, 400 U.S. 74, 80-88, 91 S. Ct. 210, 215-219 (1970)(plurality opinion).

The Court in Bourjaily, 483 U.S. at 183, 107 S. Ct. at 2782-2783 (citing Evans, 400 U.S. at 74, 91 S. Ct. at 210), did specifically distinguish state co-conspirator exceptions that "deviate[] from [the] common-law approach, admitting co-conspirators' hearsay statements made after termination of [the] conspiracy," and further indicated that a separate inquiry into reliability would be required of evidence admitted pursuant to such co-conspirator exceptions. Accordingly, we reiterate that, in Henry, 33 S.W.3d at 803, our supreme court seemingly adopted the federal approach to the co-conspirator exception in applying Tenn. R. Evid. 803(1.2)(E), affirming that the conspiracy must be ongoing at the time of the co-conspirator's statements, albeit the duration of the conspiracy will be dependent on the facts of each case, and the conspiracy does not necessarily end with the commission of the offense that was the goal of the conspiracy.[14] Correspondingly, in Alley, 968 S.W.2d at 317-318, this court observed that Tenn. R. Evid. 803(1.2)(E) is a firmly rooted hearsay exception for purposes of both the Sixth Amendment to the United States Constitution and Article 1, Section 9 of the Tennessee Constitution. See also State v. Demetrius Robinson, No. 03C01-9712-CC-00549, 1999 Tenn. Crim. App. LEXIS 192, at **2-3 (Knoxville, March 8, 1999). In short, the admission of Rickman's statements was entirely consistent with Groseclose's right to confrontation under the federal and state constitutions. Thus, while the trial court did indeed err, it did so only to the extent it prohibited the jury from considering Rickman's statements as substantive evidence of Groseclose's guilt.

### iii. Mutually Antagonistic Defenses

Groseclose's third allegation of prejudice is that "he was forced to trial with a Co-Defendant who had a different defense."[15] To the extent Groseclose is arguing that the appellants' defenses were mutually antagonistic, this court made the following observation in State v. Ensley, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996)(citations omitted)(relying upon Zafiro v. United States, 506 U.S. 534, 538, 113 S. Ct. 933, 938 (1993), and United States v. Horton, 705 F.2d 1414, 1417 (5th Cir. 1983)):

---

[14]The court thereby necessarily rejected the language in Walker, 910 S.W.2d at 384, that analogized Tennessee's co-conspirator exception to the Georgia co-conspirator exception at issue in Evans, 400 U.S. at 81, 91 S. Ct. at 215-216.

[15]Again, Groseclose alleges in his brief that this prejudice stemmed from pre-trial delay occasioned by the trial court's denial of his motion for severance. Presumably, however, this prejudice would result from the trial court's denial of his motion for severance, if at all, regardless of any delay.

> "While 'mutually antagonistic' defenses may mandate severance in some circumstances, they are not prejudicial per se." Due to the difficulty in establishing prejudice, relatively few convictions have been reversed for failure to sever on these grounds. Mere attempts to cast the blame on the other will not, standing alone, justify a severance on the grounds that the respective defenses are antagonistic. "The defendant must go further and establish that a joint trial will result in 'compelling prejudice, against which the trial court cannot protect, so that a fair trial cannot be had.'"

See also State v. Gosnell, 62 S.W.3d 740, 749 (Tenn. Crim. App. 2001), perm. to appeal denied, (Tenn 2001); State v. Clarence Mabry, No. 01C01-9112-CC-00369, 1992 Tenn. Crim. App. LEXIS 535, at **6-7 (Nashville, June 19, 1992). According to the above standard, a severance will only be granted when defenses are irreconcilable. Horton, 705 F.2d at 1417; see also State v. Alcorn, 741 S.W.2d 135, 140 (Tenn. Crim. App. 1987). In other words, belief of one defense must compel disbelief of the other. See, e.g., United States v. Pena-Lora, 225 F.3d 17, 33 (1st Cir. 2000); United States v. Tootick, 952 F.2d 1078, 1081 (9th Cir. 1991); United States v. Guerrero, 938 F.2d 725, 727-729 (7th Cir. 1991).

At trial, Rickman did not dispute his involvement in the murder of Deborah Groseclose. Rather, he argued that the jury should convict him of second degree murder instead of first degree murder. Specifically, he attempted to minimize his involvement in the murder, especially in comparison to Mount's involvement, and disclaimed any intent to murder Deborah. Groseclose simply denied any involvement in the murder of his wife, arguing that Mount orchestrated the offense. Thus, not only did belief of Rickman's defense not compel disbelief of Groseclose's defense, the two defenses were consistent in attempting to shift the majority of blame to the deceased Mount. Illustrating this point, Rickman's presentation of Louis Key's testimony in his defense was equally, if not more, beneficial to Groseclose.

### iv. Guilt by Association

Groseclose's final allegations of prejudice amount, in essence, to a claim that the trial court's refusal to sever his trial from that of Rickman caused the jury to find his "guilt by association." Groseclose first asserts a disparity in the amount of evidence adduced against each appellant. In this regard, he notes that "numerous witnesses were called by the State who had no relevant testimony regarding Groseclose and would not have been witnesses if Mr. Groseclose went to trial alone September 14, 1998." He specifically cites Hylander's testimony concerning Rickman's confession to the police and Casper's testimony concerning Rickman's attempts to call Groseclose following the discovery of Deborah's body. Indeed, Groseclose notes that the disparity in evidence was such that Rickman's defense at their joint trial entailed Rickman's admission to involvement in Deborah's murder. Secondarily, Groseclose complains that he "was forced to sit beside Rickman at trial" and "Rickman is a large, intimidating man who remained dressed in his jail clothes throughout the trial."

-47-

Disparity in the evidence against defendants is generally not sufficient alone to warrant a severance of defendants. State v. Howell, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000). We have previously explained:

> In a proper case, a defendant may be granted a severance due to the disparity of the evidence between codefendants. However, "a strong showing of prejudice" is required before a severance will be granted on this ground. The prejudice requirement is not established "simply because much of the evidence presented at trial is applicable only to his co-defendants." Rule 8(b), Tenn. R. Crim. P., contemplates that evidence may be admitted against one or more defendants which is not necessarily applicable to other defendants.

Black v. State, 794 S.W.2d 752, 758 (Tenn. Crim. App. 1990)(footnotes omitted)(citing in part United States v. Walker, 720 F.2d 1527, 1533-1534 (11th Cir. 1983)); see also United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir. 1988)("[I]t is well established that 'differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials."). Rather, a complaining defendant must show "that the jury 'was unable to sift through the evidence and "make an individualized determination as to each defendant.""" United States v. Cassano, 132 F.3d 646, 651 (11th Cir. 1998); see also United States v. Shivers, 66 F.3d 938, 940 (8th Cir. 1995); United States v. Sandini, 888 F.2d 300, 307 (3d Cir. 1989); United States v. Johnson, 763 F.2d 773, 777 (6th Cir 1985); cf. State v. James Murray, No. 01C01-9702-CR-00066, 1998 Tenn. Crim. App. LEXIS 1323, at **36-37 (Nashville, December 30, 1998); State v. Steve Ketron, No. 955, 1991 Tenn. Crim. App. LEXIS 383, at **4-7 (Knoxville, May 22, 1991).

In the instant case, we preliminarily note that most of the evidence adduced at the appellants' joint trial would in fact have been admissible at a separate trial of Groseclose to establish his "intent, knowledge, and participation as an aider and abettor" or, alternatively, as an accessory before the fact. Cf. State v. Alcorn, 741 S.W.2d 135, 140 (Tenn. Crim. App. 1987). Addressing Groseclose's specific allegations, we further note our conclusion above that Casper's testimony would have been admissible against Groseclose at a separate trial. We now broach the possibility that portions of Rickman's confession also would have been admissible at a separate trial of Groseclose pursuant to the hearsay exception pertaining to statements against interest. Tenn. R. Evid. 804(b)(3).

With respect to the possible admissibility of Rickman's confession at a separate trial of Groseclose, we must emphasize that the State was required to prove Rickman's and/or Britt's guilt of first degree murder in order to prove Groseclose's guilt of being an accessory before the fact to first degree murder. Gervin v. State, 371 S.W.2d 449, 453-454 (Tenn. 1963); Pierce v. State, 168 S.W. 851, 856 (Tenn. 1914); State v. Barbara Tipton, 1984 Tenn. Crim. App. LEXIS 2760, at *2 (Knoxville, February 29, 1984). That having been said, the plurality in Lilly v. Virginia, 527 U.S. 116, 133-134, 119 S. Ct. 1887, 1898-1899 (1999), declined to hold that, in the specific context of accomplices' confessions that inculpate a criminal defendant, the statement against interest exception

to the hearsay rule is a firmly rooted exception for purposes of the Confrontation Clause of the Sixth Amendment to the United States Constitution, albeit the government may demonstrate that a confession possesses particularized guarantees of trustworthiness dispensing with the need for confrontation. Of particular relevance to Rickman's confession, moreover, the plurality observed:

> It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when . . . the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.

Id. at 137, 119 S. Ct. at 1900.

Yet, "Lilly's full reach [is] unclear." United States v. Shea, 211 F.3d 658, 669 (1st Cir. 2000). For example, for the limited purpose of establishing the conduct of a principal in the trial of an aider and abettor or accessory before the fact, whether the redaction of an accomplice's confession would cure any presumptive unreliability is unclear. Cf. Givens v. State, 55 S.W. 1107, 1109-1110 (Tenn. 1899)(holding that the confessions of the principal "were competent" in the trial of a defendant for being an accessory before the fact, "not to fix guilt on [the defendant], but to show the guilt of [the principal] and the grade of his offense"); Self v. State, 65 Tenn. 244, 245-247 (1873)(declining to commit itself to the doctrine that "it is not permitted to the State to rely upon the confessions of the principal to establish his guilt as preliminary to an investigation of the guilt of an accessory before the fact"); cf. also United States v. Petrillo, 237 F.3d 119, 122-123 (2d Cir. 2000). In any event, even assuming that Rickman's confession to the police would have been inadmissible at a separate trial of Groseclose, Groseclose does not allege in his brief that the redaction of the confession was inconsistent with the requirements of Bruton for purposes of a joint trial, and our supreme court has held that even a co-defendant's plea of guilty before a jury at a joint trial does not require severance if the plea does not inculpate the complaining co-defendant. See State v. Coleman, 619 S.W.2d 112, 113 n.1 & 116 (Tenn. 1981); see also Dorsey v. State, 568 S.W.2d 639, 641-642 (Tenn. Crim. App. 1978); cf. State v. Armes, 673 S.W.2d 174, 178 (Tenn. Crim. App. 1984).

Finally, the record does not contain an objection by Groseclose to Rickman's appearance at trial or any objection to being seated beside his co-defendant. Tenn. R. App. P. 36(a). Moreover, Groseclose does not cite the record in support of his claim that his co-defendant was dressed in a jail uniform throughout the trial or otherwise appeared "intimidating," nor have we been able to find any reference to Rickman's appearance in the record. "Statements in briefs as to what occurred in the trial court cannot be considered unless they are supported by the record." State v. Max, 714 S.W.2d 289, 293 (Tenn. Crim. App. 1986); see also State v. Thompson, 832 S.W.2d 577, 579 (Tenn. Crim. App. 1991).

### v. The Trial Court's Exercise of Discretion

In sum, Groseclose has failed to demonstrate that he was clearly prejudiced by being jointly tried with his co-defendant. State v. Carruthers, 35 S.W.3d 516, 552 (Tenn. 2000), cert. denied, 533 U.S. 953, 121 S. Ct. 2600 (2001); State v. Howell, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000); State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988). Accordingly, we cannot say that "'the trial court's discretion ended and the granting of [a] severance became a judicial duty,'" the breach of which entitles the appellant to a reversal of his conviction. Burton, 751 S.W.2d at 447 (alteration in original). This issue is without merit.

## B.  Mount's Former Testimony

Both Groseclose and Rickman complain of the trial court's admission at trial of Mount's former testimony. The appellants apparently predicate their complaint upon two separate grounds. First, they assert that the federal district court's grant of habeas corpus relief on the basis of ineffective assistance of counsel precluded the admission upon retrial of Mount's former testimony consistent with their constitutional right to confrontation. Second, they somewhat more summarily assert that the federal district court's finding that Mount's testimony was perjured and that the State knowingly solicited perjury likewise precluded the admission of Mount's former testimony. According to the appellants, "[u]nder the doctrines of Res Judicata, Comity, Collateral Estoppel, the Law of The Case, this testimony should have been prohibited."

The State disputes the applicability of the law of the case doctrine to the rulings of the federal district court on the appellants' habeas corpus petitions. Moreover, assuming the applicability of the doctrine, the State asserts that Mount's testimony was admissible in light of both the United States Supreme Court's decision in Mancusi v. Stubbs, 408 U.S. 204, 92 S. Ct. 2308 (1972), and additional evidence presented to the trial court following the federal court's rulings. The State does not address the implications of the remaining doctrines cited by the appellants.

In the trial court, Groseclose filed a motion on August 3, 1998, to exclude Mount's testimony. Rickman did not file a separate motion to exclude Mount's testimony but, on August 4, 1998, did file a "Notice of Intent to Adopt Co-Defendant's Motions." On September 2, 1998, the trial court conducted a hearing on the joint motion to exclude Mount's former testimony. At this hearing, the State presented the testimony of Hugh Stanton, Jr., the District Attorney General for the Thirtieth Judicial District at the time of the appellants' first trial.

Stanton testified that he and Jewett Miller were the prosecutors at the appellants' first trial. Along with Miller, Stanton participated in pre-trial negotiations with the attorneys representing the different co-defendants, including the attorneys representing Barton Mount. Stanton testified that, in essence, the State agreed to sever Mount's case from that of his co-defendants in return for his testimony at the appellants' trial. Stanton denied that the State otherwise entered into any formal agreement with Mount prior to the appellants' first trial and denied soliciting perjured testimony from Mount.

Indeed, Stanton explained that he avoided making any offers of leniency to Mount prior to the appellants' first trial precisely because

> I didn't want the lawyers for Rickman and Groseclose to get up, or to be able to get up and say, well, you're testifying the way you're testifying because the Attorney General agreed to give you X number of years.

> [Also], I didn't know how many years, didn't know - - I wanted to hear his testimony, I wanted to know what he was saying. But the other lawyers understood that - - they knew me, I'd dealt with both of them, and they knew that he was going to receive a more favorable recommendation on a plea of guilty than he would have if we'd put him to trial with the other three.

In other words, Stanton assumed that, in advising their client to testify at the appellants' first trial notwithstanding the lack of any formal agreement, Mount's attorneys relied upon their past interaction with Stanton and Stanton's general reputation as a "fair man."

Stanton specifically recalled that he never stated to Mount's attorneys that the State would forego the death penalty in Mount's case in return for his testimony, albeit Stanton was "certain that they thought I would not go to the death penalty for Barton Wayne Mount if he testified and cooperated with the State." Stanton confirmed that, in fact, he did not intend to pursue the death penalty in Mount's case if Mount cooperated with the State. The former prosecutor concluded:

> I did not make an offer. I did not say you will get a good offer. I did not say you will get a bad offer. I did not say you will get a death penalty offer. I said if you want to cooper - - They came to me and said we would like to cooperate. We would like for him to testify for the State. Do you want him to testify for the State and, if so, would you sever and I said yes. Now, that's about the truth in the matter.

The trial court denied the appellants' motion on October 12, 1998. First, relying primarily upon the United States Supreme Court's decision in Mancusi, 408 U.S. at 204, 92 S. Ct. at 2308, and its own review of Mount's testimony at the appellants' first trial, the trial court concluded that the federal court's grant of habeas corpus relief on the basis of ineffective assistance of counsel did not mandate the exclusion of Mount's former testimony upon retrial. The court noted that

> [b]etween all three attorneys, Mr. Mount was thoroughly grilled for several hours. He was attacked about whether he "in fact" had made a "deal" with the State of Tennessee. There was extensive questioning about this issue. Mount's character was attacked from every conceivable angle, including his sexual propensities. He was

-51-

cross-examined in great detail about lies to the police. The sum total of several hours' was a blistering attack on his credibility. This Court is satisfied that the purpose of cross-examination was accomplished with Mr. Mount. The Court is cognizant of the fact that the Sixth Circuit Court of Appeals found Mr. Livingston and Mr. Brackstone were ineffective in their defense and their presentation of that defense of Groseclose and Rickman and this Court cannot disagree with that finding, but again, on a limited basis as it applies to the testimony of Barton Wayne Mount this Court concludes that overall the total cross-examination of Mount was effective.

Additionally, the court found

that there was no deal in exchange for Mount's testimony and that the District Attorney General did not suborn perjury. Further, this court finds that General Stanton had worked hard at developing a reputation for honesty and fairness and as a result he did not need to make a "deal" because counsel knew their client would be treated fairly. This Court is somewhat offended by the unsubstantiated attack on such a man and his reputation.

Pursuant to the trial court's ruling, as noted previously, the State introduced at the appellants' trial Mount's direct testimony from the 1978 trial. At the appellants' request, however, and notwithstanding its ruling, the trial court excluded Mount's testimony on cross-examination.

### i. Former Testimony, the Right to Confrontation, and Ineffective Assistance of Counsel

In <u>Ohio v. Roberts</u>, 448 U.S. 56, 72-74, 100 S. Ct. 2531, 2542-2543 (1980), the Supreme Court held that the federal hearsay exception governing former testimony is a "firmly rooted" exception, and satisfaction of the requirements thereof, assuming the unavailability of the declarant, will render proffered evidence immune from challenge under the Confrontation Clause of the Sixth Amendment to the United States Constitution. <u>See also</u> <u>United States v. Mann</u>, 161 F.3d 840, 861 (5th Cir. 1998); <u>United States v. McKeeve</u>, 131 F.3d 1, 9 (1st Cir. 1997); <u>United States v. Kelly</u>, 892 F.2d 255, 262 (3d Cir. 1989). Prior to the adoption of the Tennessee Rules of Evidence, our supreme court adopted the federal rule "as a statement of the current law in Tennessee." <u>State v. Causby</u>, 706 S.W.2d 628, 631 (Tenn. 1986); <u>see also</u> <u>State v. Howell</u>, 868 S.W.2d 238, 250 & 250 n.2 (Tenn. 1993). Moreover, Tenn. R. Evid. 804(b)(1) is substantially identical to the federal rule, albeit Fed. R. Evid. 804(b)(1)(emphasis added) more liberally permits the introduction of former testimony if, "in a civil action or proceeding, <u>a predecessor in interest</u> [to the party against whom the testimony is now offered], had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." <u>See</u> <u>State v. Ernest Jay Walker</u>, No. 03C01-9110-CR-00346, 1993 Tenn. Crim. App. LEXIS 111, at *27 & 27 n.4 (Knoxville, February 22, 1993). In short, satisfaction of Tenn. R. Evid. 804(b)(1) will likewise satisfy constitutional requirements of confrontation. <u>See,</u>

e.g., State v. Bilbrey, 912 S.W.2d 187, 187-188 (Tenn. Crim. App. 1995); State v. Michael G. Waldrum, No. M1999-01924-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 937, at \*\*28-29 (Nashville, December 8, 2000).

> Tenn. R. Evid. 804(b) provides:
>
> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) Former Testimony. - Testimony given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination.

The critical question in determining the admissibility of former testimony is "'whether fairness allows imposing, upon the party against whom [it is] now offered, the handling of the witness on the earlier occasion.'" Howell, 868 S.W.2d at 250. The appellants assert that in this case the federal courts' adjudication of ineffective assistance of counsel dictates a negative response to this "critical" question.

In Roberts, 448 U.S. at 73 n.12, 100 S. Ct. at 2543 n.12, the United States Supreme Court held that, generally speaking, a court need not explore the adequacy of counsel's cross-examination at the earlier proceeding as a prerequisite to admitting former testimony. The Court articulated an exception to this rule, however, when a defendant's representation in an earlier proceeding has been adjudicated ineffective. Id. "Under those unusual circumstances, it [is] necessary to explore the character of the actual cross-examination to ensure that an adequate opportunity for full cross-examination [has] been afforded to the defendant." Id. The Court relied upon Mancusi, 408 U.S. at 214-216, 92 S. Ct. at 2313-2315, for the proposition that ineffective assistance of counsel at the earlier proceeding will only render former testimony inadmissible if the ineffective assistance actually affected the cross-examination of the currently unavailable witness. See also, e.g., United States v. Ciak, 102 F.3d 38, 43-44 (2d Cir. 1996); State v. Joyner, 774 A.2d 927, 928-938 (Conn. 2001); People v. Jones, 78 Cal. Rptr. 2d 265, 268-270 (Cal. Ct. App. 1998).

According to the appellants, the federal district court's grant of habeas corpus relief on the basis of ineffective assistance of counsel encompassed a finding that the ineffectiveness actually affected counsel's cross-examination of Mount, and this finding is binding upon the trial court pursuant to the doctrines of "Res Judicata, Comity, Collateral Estoppel, the Law of The Case." We note that, other than providing this laundry list of potentially applicable doctrines, the appellants fail to cite any authority in support of or provide any argument concerning, specifically, the application of these doctrines. Tenn. R. App. P. 27(a)(7); Tenn. Ct. of Crim. App. Rule 10(b). Moreover, in the trial court, the appellants' argument suffered from a similar lack of clarity. Tenn.

-53-

R. App. P. 36(a).  Indeed, the appellants seemingly relied solely upon the law of the case doctrine. Id.  Notwithstanding waiver, we will address the appellants' argument.

In Groseclose v. Bell, 895 F. Supp. 935, 954-960 (M.D. Tenn. 1995), the federal district court concluded that the performance of Groseclose's attorney at his first trial "'fell below an objective standard of reasonableness'" in numerous respects, and, indeed, counsel failed "to subject the prosecution's case to meaningful adversarial testing" or otherwise "function in any meaningful sense as the Government's adversary."  In relevant part, the court noted counsel's deficiency with respect to cross-examination of witnesses generally and with respect to cross-examination of Mount specifically.  Id. at 959.  The court emphasized that counsel's cross-examination of Mount consumed only eleven pages of transcript and cited the description by attorney Charles Fels at the federal habeas corpus evidentiary hearing of counsel's cross-examination "as 'a remarkably limited effort for a critical major witness against your client.'"  Id.  Finally, the court concluded that counsel's failures "prejudiced the defense so as to deprive Groseclose of a fair trial."  Id. at 960.  Alternatively, citing United States v. Cronic, 466 U.S. 648, 659, 104 S. Ct. 2039, 2047 (1984), the court concluded that counsel's failure to subject the prosecution's case to meaningful adversarial testing warranted a presumption of prejudice.  Groseclose, 895 F. Supp. at 960.

In Groseclose v. Bell, 130 F.3d 1161, 1169-1170 (6th Cir. 1997), the United States Court of Appeals for the Sixth Circuit affirmed the district court's conclusion that the appellant's counsel had rendered deficient performance but, because prejudice was "so patent," declined to address whether or not counsel's performance was sufficiently inept to require a presumption of prejudice.  In assessing counsel's performance, the court of appeals similarly noted the brevity of counsel's cross-examination of Mount, "perhaps the most crucial witness for the State."  Id. at 1166.

In Rickman v. Dutton,  864 F. Supp. 686, 704 (M. D. Tenn. 1994), the district court concluded that Rickman's counsel at his first trial "was hostile to his client and so burdened by a conflict of interest that he failed to subject the prosecution's case to meaningful adversarial testing as required under the Sixth Amendment."  Significantly, the court specifically noted:

> In the instant action, there is overwhelming evidence that [trial counsel] was sympathetic to the prosecution and effectively abandoned representation of Rickman at trial.  For example, in cross-examining prosecution witness and co-conspirator Barton Wayne Mount, [counsel] suggested to Mount that Mount had carefully planned out the crime with Rickman and the other co-defendants "to the nth degree," listing the name of each co-defendant separately for greater emphasis. . . .  [Counsel] reinforced the notion of planning despite proof which suggested that the defendants entered the victim's residence without a lethal weapon and may have lacked a coherent plan at that point as to how she was to be killed.

> [Counsel] repeatedly elicited testimony which portrayed Rickman in
> a deviant, destructive, and threatening light. [Counsel] asked Mount
> if he did not consider the defendants to be "nuts," if he thought them
> to be "normal," chided Mount because Mount "never suspected that
> there was anything wrong with either one of them," and concluded,
> "You wouldn't know a psychiatric case if you saw one, would you?"

Id. at 702.  The court concluded that a presumption of prejudice was warranted pursuant to Cronic, 466 U.S. at 659, 104 S. Ct. at 2047.  Rickman,  864 F. Supp. at 704.


In Rickman v. Bell, 131 F.3d 1150, 1156 (6th Cir. 1997), the United States Court of Appeals for the Sixth Circuit agreed with the district court that counsel's performance was so egregious as to amount to the constructive denial of any assistance of counsel.  In particular, the court noted that counsel's cross-examination of Mount illustrated counsel's hostility toward his client in that he elicited testimony damaging to Rickman.  Id. at 1158.


In assessing the impact of these federal court decisions upon the admissibility of Mount's former testimony at the appellants' retrial, we will first briefly address the applicability of the law of the case doctrine.  Our supreme court has observed that

> [t]he phrase "law of the case" refers to a legal doctrine which
> generally prohibits reconsideration of issues that have already been
> decided in a prior appeal of the same case.  In other words, under the
> law of the case doctrine, an appellate court's decision on an issue of
> law is binding in later trials and appeals of the same case if the facts
> on the second trial or appeal are substantially the same as the facts in
> the first trial or appeal.

Memphis Publ'g Co. v. Tennessee Petroleum Underground Storage Tank Bd., 975 S.W.2d 303, 306 (Tenn. 1998); see also State v. Jefferson, 31 S.W.3d 558, 560-561 (Tenn. 2000).  Collateral federal habeas corpus proceedings, however, do not qualify as "a prior appeal of the same case."  Rather,

> "The whole history of the [federal] writ [of habeas corpus] -- its
> unique development -- refutes a construction of the federal courts'
> habeas corpus powers that would assimilate their task to that of courts
> of appellate review. The function on habeas is different. It is to test
> by way of an original civil proceeding, independent of the normal
> channels of review of criminal judgments, the very gravest
> allegations."

Kaufman v. United States, 394 U.S. 217, 223-224, 89 S. Ct. 1068, 1072-1073 (1969); see also, e.g., United States v. Morgan, 346 U.S. 502, 505 n.4, 74 S. Ct. 247, 249 n.4 (1954)(observing that a writ of error coram nobis "is a step in the criminal case and not, like habeas corpus where relief is sought in a separate case and record, the beginning of a separate civil proceeding"); Palma v. United States, 228 F.3d 323, 327 (3d Cir. 2000)(observing that "a petition for a writ of habeas corpus is an

independent civil action even though the detention complained of arises out of a criminal action"); Anderson v. Singletary, 111 F.3d 801, 804 (11th Cir. 1997)(observing that habeas corpus cases "'are independent civil dispositions of completed criminal proceedings'").[16] Accordingly, we agree with the State that the appellants' reliance upon the law of the case doctrine is misplaced.

Turning to the remaining doctrines cited by the appellants, we note that judicial comity is "[t]he respect a court of one state or jurisdiction shows to another state or jurisdiction in giving effect to the other's laws and judicial decisions." Black's Law Dictionary 262 (7th ed. 1999). We need not, however, decide whether considerations of judicial comity alone would bind the trial court in this case to the federal habeas court's assessment of counsel's effectiveness in cross-examining Mount during the appellants' first trial because we conclude that the doctrine of collateral estoppel effects that result. Collateral estoppel is a corollary of the doctrine of res judicata and prevents parties from relitigating any issue that was actually litigated and finally decided in an earlier action. 46 Am. Jur. 2d Judgments § 516, at 780-781 (1994). In other words, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153, 99 S. Ct. 970, 973 (1979); see also Knox County Educ. Ass'n v. Knox County Bd. of Educ., 158 F.3d 361, 376 (6th Cir. 1998).

In applying the doctrine of collateral estoppel in this case, we acknowledge decisions by the United States Supreme Court indicating that state courts are bound to apply federal rules in determining the preclusive effect of federal court decisions on issues of federal law. Heck v. Humphrey, 512 U.S. 477, 488 n.9, 114 S. Ct. 2364, 2373 n.9 (1994); see also Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 507, 121 S. Ct. 1021, 1027 (2001); Gibson v. Trant, 58 S.W.3d 103, 114 n.4 (Tenn. 2001). Accordingly, we are bound to follow the prescription by the United States Court of Appeals for the Sixth Circuit of the following prerequisites to a court's application of the doctrine of collateral estoppel:

> (1) the issue in the subsequent litigation [must be] identical to that resolved in the earlier litigation, (2) the issue [must have been] actually litigated and decided in the prior action, (3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation, (4) the party to be estopped was a party to the

---

[16]In Roane v. Washington County Hosp., 769 A.2d 263, 266 (Md. Ct. Spec. App. 2001), the Maryland court narrowly interpreted the law of the case doctrine to "apply only within a given court system." Similarly, the Kentucky Supreme Court observed in Sherley v. Commonwealth, 889 S.W.2d 794, 797 (Ky. 1994), that the law of the case doctrine is "reserved for situations where the decision of a superior court within the same judicial organization is binding on a subsequent trial court of that judicial organization or upon itself." Conversely, several federal courts have suggested that the law of the case doctrine is applicable to separate cases in different court systems when the cases involve the same parties and the same subject matter. Gage v. General Motors Corp., 796 F.2d 345, 349-350 (10th Cir. 1986); Barrett v. Baylor, 457 F.2d 119, 123-124 (7th Cir. 1972). But see Forest City Chevrolet v. Waterford of Portland, LLC, 172 F. Supp. 2d 227, 228-229 (D. Me. 2001). We believe that these two approaches are, respectively, too narrow and too broad.

> prior litigation . . . , and (5) the party to be estopped had a full and fair
> opportunity to litigate the issue.

Hammer v. INS, 195 F.3d 836, 840 (6th Cir. 1999). Moreover, a trial court's assessment of the availability of collateral estoppel is a mixed question of law and fact that an appellate court reviews de novo. Id.

Again, in order to determine whether the admission of Mount's former testimony would violate Tenn. R. Evid. 804(b)(1) and the appellants' right to confrontation, the trial court was required to determine whether counsel's ineffectiveness at the appellants' first trial extended to their cross-examination of Mount. A fair reading of the federal courts' decisions in the appellants' habeas corpus proceedings leads inexorably to the conclusion that the same issue was litigated before and decided by the federal courts. As to whether the resolution of the issue was necessary and essential to the judgments on the merits in the prior proceedings, both the federal district court and the federal court of appeals specifically cited counsel's cross-examination of Mount as grounds for concluding that the appellants received ineffective assistance. Cf. Mancusi, 408 U.S. at 214, 92 S. Ct. at 2313-2314; Ciak, 102 F.3d at 43-44; Joyner, 774 A.2d at 936-938. Finally, the State was clearly a party to the federal habeas corpus proceedings and had a full and fair opportunity to litigate the effectiveness of counsel's cross-examination of Mount. Accordingly, the State was estopped from asserting that the appellants had an opportunity to develop Mount's testimony by cross-examination at their first trial.

Notwithstanding the effect of the doctrine of collateral estoppel, the trial court suggested that any violation of Tenn. R. Evid. 804(b)(1) and any denial of the appellants' right to confrontation were avoided by co-defendant Britt's cross-examination of Mount at the appellants' first trial. In this regard, we preliminarily note that Tenn. R. Evid. 804(b)(1) provides that "it is the party against whom the testimony is now offered" that must have had "both an opportunity and a similar motive" to cross-examine the unavailable witness at the prior proceedings." Accordingly, from a purely evidentiary perspective, the trial court erred in admitting Mount's testimony on the basis of his cross-examination by Britt's attorney. Our conclusion that the admission of Mount's testimony was inconsistent with Tenn. R. Evid. 804(b)(1), however, does not necessarily resolve the appellants' claim that the admission violated their right to confrontation.

The admission of Mount's testimony was likewise inconsistent with the slightly more liberal federal counterpart to Tenn. R. Evid. 804(b)(1), a point that is significant only to the extent that the Supreme Court has held that the satisfaction of the requirements thereof will render proffered evidence immune from challenge under the Confrontation Clause of the Sixth Amendment to the United States Constitution. As noted previously, Fed. R. Evid. 804(b)(1) provides for the introduction of former testimony if, "in a civil action or proceeding, a predecessor in interest [to the party against whom the testimony is now offered] had an opportunity and similar motive to develop the testimony." In United States v. McDonald, 837 F.2d 1287, 1291 (5th Cir. 1988), the United States Court of Appeals for the Fifth Circuit agreed with the defendant's interpretation of Fed. R.

Evid. 804(b)(1) that "the phrase 'in a civil action' refers to the type of proceeding in which the [former testimony occurred] rather than the type of proceeding in which the [former testimony] is offered." Accordingly, the court held that, "[i]f a party in a civil case and the government in a later criminal case have sufficiently similar incentives to develop the testimony, we see no reason to conclude that the rule [governing the admission of former testimony] is necessarily and always unavailable to a criminal defendant." McDonald, 837 F.2d at 1292-1293. Significantly, the court cautioned that "there is some common ground that the predecessor in interest clause is inapplicable when testimony is sought to be introduced against a criminal defendant," id. at 1291 (emphasis added), but conceded that the Seventh Circuit had departed from this view in United States v. Feldman, 761 F.2d 380, 385 & 387 (7th Cir. 1985), at least in the context of former testimony from a prior civil action. This court has found no authority supporting the admission against a criminal defendant under the federal rule of former testimony from a prior criminal action when a predecessor in interest, as opposed to the defendant himself, had an opportunity and similar motive to develop the testimony. Moreover, the notes of the federal Advisory Committee on the former testimony exception observe that the United States Supreme Court has not resolved the question of whether, for purposes of the constitutional requirement of confrontation, "the accused must himself have been a party to the earlier proceeding or whether a similarly situated person will serve the purpose." Cf. Olson v. Green, 668 F.2d 421, 429 (8th Cir. 1982)("The right to confront witnesses is a constitutional right personal to the accused.").

Still, it is worthy of repeating that, even if hearsay testimony does not fall within a firmly rooted hearsay exception, it will not violate a defendant's right to confrontation if it bears its own "'particularized guarantees of trustworthiness.'" Lilly v. Virginia, 527 U.S. 116, 125, 119 S. Ct. 1887, 1894 (1999)(plurality opinion); see also Roberts, 448 U.S. at 66, 100 S. Ct. at 2539. In short, "the Clause countenances . . . hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'" Roberts, 448 U.S. at 65, 100 S. Ct. at 2539; see generally Lee v. Illinois, 476 U.S. 530, 540, 106 S. Ct. 2056, 2062 (1986). Nevertheless, we need not decide here whether Britt's cross-examination of Mount afforded his testimony an additional guarantee of trustworthiness sufficient to rebut its presumptive unreliability as we conclude below that any error in the admission of the testimony was harmless beyond a reasonable doubt.

### ii. Perjured Testimony

As noted by the appellants, the federal district court also found that (1) "Mount testified falsely when he stated that he had received no benefit and expected to get no benefit from his testimony," (2) "[t]he State was under an affirmative duty to correct Mount's false and misleading testimony, and . . . failed to do so," and (3) the "State failed to provide material evidence with which [the defendant] could have effectively cross-examined and impeached Mount, and which demonstrates that Mount testified falsely at trial." Rickman v. Dutton, 864 F. Supp. 686, 705-706 (M.D. Tenn. 1994); see also Groseclose v. Bell, 895 F. Supp. 935, 960 (M.D. Tenn. 1995). However, the United States Court of Appeals for the Sixth Circuit declined to address this issue in

light of its disposition of the appellants' cases on the basis of ineffective assistance of counsel. Groseclose v. Bell, 130 F.3d 1161, 1171 (6th Cir. 1997); Rickman v. Bell, 131 F.3d 1150, 1152 (6th Cir. 1997).

We conclude that the trial court was not bound by the federal district court's findings concerning the perjured nature of Mount's testimony.

> It is a well-established principle of federal law that if an appellate court considers only one of a lower court's alternative bases for its holding, affirming the judgment without reaching the alternative bases, only the basis that is actually considered can have any preclusive effect in subsequent litigation.

Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians, 94 F.3d 747, 754 (2d Cir. 1996); see also Hicks v. Quaker Oats Co., 662 F.2d 1158, 1168 & 1168 n.6 (5th Cir. 1981). Moreover, because the appellants rest their challenge to the trial court's findings concerning the perjured nature of Mount's testimony entirely upon the preclusive effect of the federal district court's findings, we need not otherwise address the propriety of the trial court's ruling.

### iii. Harmless Error

Even assuming that the trial court violated the appellants' right to confrontation by admitting Mount's former testimony, this conclusion does not necessarily require the reversal of the appellants' convictions. Rather, a violation of the right to confrontation is subject to harmless error analysis in accordance with the standard enunciated in Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967). See, e.g., Lilly v. Virginia, 527 U.S. 116, 139-140, 119 S. Ct. 1887, 1901 (1999). Because "[t]he line between harmless and prejudicial error is in direct proportion to the degree of the margin by which the proof exceeds the standard required to convict beyond a reasonable doubt," State v. Carter, 714 S.W.2d 241, 248 (Tenn. 1986); State v. Adkisson, 899 S.W.2d 626, 644 (Tenn. Crim. App. 1994), we turn to examine both the State's burden of proof at trial and the evidence adduced in satisfaction of that burden.

Again, the jury found Rickman guilty of the first degree murder of Groseclose's wife. At the time of the appellants' offenses, Tenn. Code Ann. § 39-2401 (1975) provided, "If any person of sound memory and discretion, unlawfully kill[s] any reasonable creature in being, and under the peace of the state, with malice aforethought, either express or implied, such person shall be guilty of murder." Malice aforethought was defined as "the intent to do any unlawful act that will likely result in taking the life of another." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). All murders were deemed murder in the second degree unless "perpetrated by means of poison, lying in wait, or by other kind of wilful, deliberate, malicious, and premeditated killing," in which case the offense was enhanced to first degree murder. Tenn. Code Ann. § 39-2402(a) (1977 Supp.); Tenn. Code Ann.

§ 39-2403 (1975).[17]  As always, the burden was upon the State at the appellants' trial to prove the premeditation and deliberation necessary to enhance Rickman's offense to first degree murder.  See, e.g., State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992); State v. Bullington, 532 S.W.2d 556, 560 (Tenn. 1976).  In Brown, 836 S.W.2d at 540-541 (emphasis in original), our supreme court offered the following definitions of premeditation and deliberation:

> "'Premeditation' is the process simply of thinking about a proposed killing before engaging in the homicidal conduct; and 'deliberation' is the process of carefully weighing such matters as the wisdom of going ahead with the proposed killing, the manner in which the killing will be accomplished, and the consequences which may be visited upon the killer if and when apprehended.  'Deliberation' is present if the thinking, i.e., the 'premeditation,' is being done in such a cool mental state, under such circumstances, and for such a period of time as to permit a 'careful weighing' of the proposed decision."

In contrast, the jury found Groseclose guilty of being an accessory before the fact to the first degree murder of his wife.  An accessory before the fact was defined as "[a]ny person who shall feloniously move, incite, counsel, hire, command, or procure any other person to commit a felony."  Tenn. Code Ann. § 39-107 (1975).  As indicated earlier in the opinion, in order to convict Groseclose of being an accessory before the fact to the first degree murder of his wife, the State was first required to prove that Rickman and/or Phillip Britt actually committed the murder.  Gervin v. State, 371 S.W.2d 449, 453-454  (Tenn. 1963); Pierce v. State, 168 S.W. 851, 856 (Tenn. 1914); State v. Barbara Tipton, 1984 Tenn. Crim. App. LEXIS 2760, at *2 (Knoxville, February 29, 1984). The State was further required to prove that Groseclose shared in the principals' intent to commit first degree murder.  State v. Carson, 950 S.W.2d 951, 954 (Tenn. 1997); see also Presley v. State, 30 S.W.2d 231, 233-234 (Tenn. 1930); 22 C.J.S. Criminal Law § 138, at 172 (1989).  "[P]resence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred."  State v. McBee, 644 S.W.2d 425, 428-429 (Tenn. Crim. App. 1982); see also State v. Jones, 15 S.W.3d 880, 890 (Tenn. Crim. App. 1999); State v. Ronald Haynes, No. M2000-00204-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 416, at **12-13 (Nashville, June 1, 2001); State v. Prentiss Phillips, No. W2000-00245-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 182, at **20-21 (Jackson, March 9, 2001), perm. to appeal denied and recommended for publication, (Tenn. 2001).

In any event, neither Rickman's conviction nor Groseclose's conviction could rest upon the uncorroborated testimony of an accomplice.  State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Sherrill v. State, 321 S.W.2d 811, 814 (Tenn. 1959).  "An accomplice is one who 'knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime,'" State v. Jackson, 52 S.W.3d 661, 666 (Tenn. Crim. App. 2001), i.e., one subject to

---

[17]The trial court declined to instruct the jury on the offense of felony murder.

indictment for the same offense charged against the principal offender, <u>Pennington v. State</u>, 478 S.W.2d 892, 897-898 (Tenn. Crim. App. 1971). In other words, being an accomplice requires something more than having guilty knowledge, being morally delinquent, or participating in a related but distinct crime with the principal offender. <u>Id.</u> In connection with these principles, we have held that an accessory before the fact and the actual perpetrator or principal in the crime are accomplices, <u>Boaz v. State</u>, 537 S.W.2d 716, 718 (Tenn. Crim. App. 1975), whereas an accessory after the fact and the actual perpetrator or principal are not, <u>Pennington</u>, 478 S.W.2d at 898.

In this case, the State relied in part upon the testimonies of both Phillip Britt and Barton Mount to attain the convictions of Rickman and Groseclose. It was essentially undisputed that both Britt and Mount were accomplices in the murder of Deborah Groseclose. <u>Cf.</u> <u>State v. Lawson</u>, 794 S.W.2d 363, 369-370 (Tenn. Crim. App. 1990). Nevertheless, the trial court instructed the jury that it was to decide whether or not any witness was an accomplice, and the court further provided a general instruction on how to evaluate accomplice testimony. The trial court erred in that it should have instructed the jury as a matter of law that Britt and Mount were accomplices:

> When it is clear and undisputed that the witness participated in the crime, the trial court decides as a question of law whether he or she is an accomplice. The question becomes one of fact for the jury to decide when the facts are in dispute or susceptible to different inferences. In other words, where a witness denies involvement in the crime, the question of whether he or she is an accomplice is one of fact to be submitted to the jury with proper instructions from the court on how to consider such testimony.

<u>Anderson</u>, 985 S.W.2d at 16 (citations omitted); <u>State v. Jerry McPeak, IV</u>, No. W2001-00764-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 129, at *14 n.1 (Jackson, February 14, 2002). Notwithstanding the trial court's error, it was the appellants' obligation to submit a special request or otherwise object to the trial court's instruction. <u>Anderson</u>, 985 S.W.2d at 17-18. Moreover, the lack of any significant dispute concerning Britt's and Mount's roles in the appellants' offenses in addition to our subsequent conclusion concerning the "degree of the margin by which the proof exceed[ed] the standard required to convict beyond a reasonable doubt" preclude any relief for the appellants. <u>Carter</u>, 714 S.W.2d at 248.

Because juries make no finding on the record about whether they deem an individual to be an accomplice, we will assume for purposes of this discussion the jury's finding that, not only Britt and Mount, but also Pamela Baker was an accomplice. Accomplices generally cannot corroborate each other, <u>State v. Stout</u>, 46 S.W.3d 689, 696-697 (Tenn.), <u>cert. denied</u>, __ U.S. __, 122 S. Ct. 471 (2001); <u>State v. Fowler</u>, 373 S.W.2d 460, 462-463 (Tenn. 1963); <u>State v. Green</u>, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995), albeit a defendant's own inculpatory statements can corroborate his accomplice's testimony, <u>Stout</u>, 46 S.W.3d at 696-697; <u>State v. Anderson</u>, 985 S.W.2d 9, 16-17 (Tenn. Crim. App. 1997). Thus, the value in presenting the testimonies of multiple accomplices in this case lay in providing to the jury alternatives should it decide against accrediting

one. We are confident in concluding beyond a reasonable doubt that, even absent Mount's (or Baker's) testimony, the jury would have accredited Britt's.

Generally speaking, we have described the quantum of evidence necessary to corroborate an accomplice's testimony in the following manner:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence be slight and entitled, when standing alone, to little consideration.

> "The entire conduct of the accused may be looked to for the corroborating circumstances; and if, from those circumstances, the crime may fairly be inferred, the corroboration is sufficient."

Hawkins v. State, 469 S.W.2d 515, 520 (Tenn. Crim. App. 1971)(citations omitted); see also State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001), cert. denied, __ U.S. __, 122 S. Ct. 925 (2002); Bigbee, 885 S.W.2d at 803; Sherrill, 321 S.W.2d at 815. "Evidence which merely casts a suspicion on the accused or establishes that he had an opportunity to commit the crime in question is inadequate to corroborate an accomplice's testimony." State v. Adkisson, 899 S.W.2d 626, 644 (Tenn. Crim. App. 1994); see also State v. Griffis, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). Whether sufficient corroboration exists is a determination for the jury. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001).

In summary, Britt testified that Groseclose hired him and Rickman to murder Deborah and intended to pay them, at least in part, with the proceeds of insurance policies on Deborah's life. Britt recounted in detail both the extensive planning in which the conspirators engaged and the execution of the resultant murder plan by himself and Rickman. Far more than the requisite "slight" evidence corroborated this testimony, both establishing the commission of the charged offenses and connecting each defendant thereto.

With respect to the commission of the offenses, for example, Dr. Harlan's testimony largely corroborated Britt's account of the manner in which Deborah died and of the disposal of her body. Scola's and Wolfe's testimonies likewise corroborated Britt's account of the disposal of Deborah's body in addition to his assertion that both he and Rickman wore gloves during Deborah's murder and while transporting her body to the parking lot of Memphis' main public library. Indeed, Britt assisted the police in recovering the gloves from a "Union 76" service station within a short distance of the main public library. Additionally, the police's recovery of Deborah's purse from a Walgreen's drug store located within several blocks of the Groseclose home corroborated Britt's account of the conspirators' efforts to divert suspicion from Groseclose, as did Groseclose's confirmation to police that credit cards and cash were missing from his wife's purse and his report to police that, on the day prior to Deborah's murder and consequent disappearance, she had been followed home from work by a stranger. Also, the records of the First Tennessee Bank confirmed Britt's account of Rickman's unsuccessful attempt to withdraw money from the Groseclose account using Deborah's ATM card on the morning of her murder and disappearance.

As to Rickman's connection to the commission of the first degree murder of Deborah Groseclose, suffice it to say that his own confession to the police overwhelmingly corroborated Britt's testimony. With respect to Groseclose, the evidence corroborating Britt's testimony was circumstantial but likewise overwhelming. Specifically, Britt's assertion of Groseclose's involvement was corroborated by Scroggins' and Perkins' testimonies concerning Groseclose's status as the beneficiary of insurance policies on Deborah's life amounting to $32,788 and his attempt one month prior to his wife's death to increase the amount of one of those policies. Moreover, the appellant himself confirmed to police that he and his wife were experiencing marital difficulties of such magnitude that he had been sleeping in his van for several nights prior to Deborah's murder, and Ann Marie Adams testified that Groseclose was recording telephone calls to and from his home without his wife's knowledge or consent. The State also presented the testimonies of no less than five witnesses, all with no apparent interest in the outcome of this case, concerning Groseclose's attempts to locate someone willing to murder his wife. Moreover, Jerry Cochran testified that, on the day of Deborah's funeral, Groseclose admitted that he knew the identity of his wife's murderers. The records of the First Tennessee Bank confirmed that, on June 27, 1977, two days prior to Deborah's murder and disappearance, Groseclose withdrew $100 from his bank account, and Melville Taylor testified that, on the same day, he loaned Groseclose $50. Also on the same day, according to Mary Vance, the ostensibly unemployed Rickman paid $100 toward Donnie Tatum's rent in five $20 bills. Finally, abundant evidence established Groseclose's association with the principal offenders both prior to and following his wife's murder. For example, Anne Marie Adams testified that she saw Mount at the Groseclose home on several occasions prior to Deborah's murder and disappearance and on the day thereof. Taylor testified that Mount was with Groseclose when Taylor loaned the appellant $50 prior to Deborah's murder. Aline Watts testified that, on the day of her daughter's murder and disappearance, she observed both Barton Mount and Phillip Britt at the appellant's home. The appellant himself confirmed that he spoke with Phillip Britt on the day of his wife's murder and disappearance. Also, Casper testified that, following the discovery of Deborah's body, Rickman made several attempts to contact Groseclose.

In characterizing the evidence in the appellants' case as overwhelming, we acknowledge both Britt's agreement with the State and Deborah's family in exchange for his testimony and some inconsistencies in Britt's testimony. However, neither fact undermines the strength of the corroborating evidence that we have attempted to highlight in this opinion.

### C. Gary King's Testimony

Groseclose additionally argues that the trial court erred in excluding Gary King's testimony concerning remarks made by Groseclose to King during the appellant's trip to Kingsport immediately prior to his wife's murder. Specifically, Groseclose sought to introduce his statements to King that he "was tired of the crime in Memphis and wanted to move his family to Kingsport" and that he "was trying to find employment and did not seek to borrow money." Groseclose argues that his statements were admissible pursuant to the state of mind exception to the general rule excluding hearsay and, moreover, were relevant "to refute what Barton Mount had testified to about moving in with Groseclose." Tenn. R. Evid. 803(3).[18] The State responds:

> [I]n order to fit under the state of mind exception Mr. King would have to testify that the defendant told him he was in Kingsport because he was moving back to Kingsport. However, the defendant only stated that he was thinking about moving. The defendant showed no intention of moving. Had the defendant said he was in Kingsport looking for a job and a home, then his statement may have been proper under the state of mind exception.

Alternatively, the State asserts that any error was harmless.

Before the trial court and outside the jury's presence, Groseclose proffered Gary King's testimony that, during Groseclose's visit to Kingsport shortly before his wife's murder, he made the following remarks to King: "Well, [I'm] trying to get out of Memphis. I'm thinking about maybe moving back up here. The crime rate is high in Memphis. I want to try and to get my family out of there and move back to . . . Kingsport." King added that Groseclose expressed an interest in looking for a job in Kingsport. King concluded that the appellant never asked to borrow money from King during the visit.

---

[18]The appellant also asserts in his brief that his statements to King were relevant to "refute[] the testimony of Phillip Britt regarding a meeting." However, in challenging the sufficiency of the evidence underlying his conviction of being an accessory before the fact to first degree murder, the appellant asserts:

> Britt stated the meeting he thought took place between Groseclose and Rickman occurred one week prior to Mrs. Groseclose's disappearance. Both Aline Watts . . . and Gary King . . . testified that William Groseclose was in Kingsport, Tennessee one week prior to Mrs. Groseclose's disappearance.

In short, the appellant himself concedes that the trial court's exclusion of the hearsay evidence at issue did not preclude King from testifying concerning Groseclose's presence in Kingsport shortly before his wife's murder. Moreover, we note that, in fact, Britt was uncertain concerning the timing of the meeting referred to above.

In advocating the introduction of this testimony, Groseclose argued to the trial court that his statements to King were admissible pursuant to the state of mind exception to the rule against hearsay and, somewhat more articulately than on appeal, noted that the statements were relevant to establish

> whether [Groseclose] was trying to have his wife killed, or whether he was moving out of Memphis back to Kingsport.
>
> . . . .
>
> The state's witnesses are all saying that he hated Deborah and he wanted her dead. We have a witness who says he wanted to move his family back here; he was going to come up here and work with his family.

Contrary to the appellant's suggestion in his brief, the trial court ultimately admitted King's testimony that Groseclose never attempted to borrow money from King. However, the trial court otherwise declined to admit the proffered testimony pursuant to the state of mind exception to the hearsay rule. The trial court ruled:

> I don't think it fits under the exception of an existing mental state to prove - - the fact you're wanting to prove is that he intended to move to Kingsport, that's not what this man is testifying to - - not what I heard.
>
> . . . .
>
> All I heard was he said that there was a crime problem in Memphis and that he would like to move his family out of there, and he was thinking about coming back to Kingsport.
>
> . . . .
>
> If it was an issue - - if he had come back to Memphis and said, "We're moving to Kingsport," and he came back down here and he told people, "We're moving to Kingsport," and then there was a question of whether that occurred or not, this, I could conceive, being relevant. But there's no indication, other than a hearsay statement

that was offered, that that goes to any mental state or state of mind. I don't think it fits under that exception.

Tenn. R. Evid. 803(3) provides that the general rule proscribing hearsay does not exclude the following out-of-court statement:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The Advisory Commission Comments to Tenn. R. Evid. 803(3) further provide that, "[c]ombining th[is] hearsay exception with relevancy principles, declarations of mental state will be admissible to prove mental state at issue." Correspondingly, declarations of mental state, such as an intent to engage in certain conduct, will be admissible to prove conduct consistent with that mental state. Id.; cf. State v. Hailey, 658 S.W.2d 547, 552 (Tenn. Crim. App. 1983)(citing Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 295-296, 12 S. Ct. 909, 912-913 (1892)).

In addressing Groseclose's complaint, we find it useful to first distinguish from the instant case several scenarios in which Tenn. R. Evid. 803(3) may have no application. For example, one noted authority has observed:

> In order for Rule 803(3) to apply, the declarations of mental condition should expressly assert the declarant's mental state. . . . Many times a statement does not literally assert the declarant's mental state when offered to prove that mental state. If so, the statement should be admitted as nonhearsay because it is not admitted to prove its truth.

Neil P. Cohen et al., Tennessee Law of Evidence § 8.08(3)(a), at 8-71 (LEXIS Law Publishing 4th ed. 2000). In other words, "[c]ircumstantial declarations are nonhearsay, . . . while direct evidence of state of mind is admissible under Rule 803(3)." Id. at 8-72 n.266. In this case, the appellant was concededly attempting to introduce his out-of-court statements to King as circumstantial evidence of his conciliatory feelings toward his wife. Nevertheless, the appellant's statements expressly asserted a mental state, i.e., his contemplation of moving to Kingsport with his family and his interest in searching for employment in Kingsport. In other words, the appellant was attempting to use express assertions of one mental state as circumstantial evidence of another. Moreover, the express assertions of a mental state did not qualify as nonhearsay because they only permitted the desired inference if true, i.e., if in fact Groseclose was contemplating moving to Kingsport with his family and was interested in searching for employment in Kingsport.

Additionally, at least one court interpreting the identical federal counterpart to Tenn. R. Evid. 803(3) has held that, while positive statements of a declarant's future intent or design are

generally admissible to show that the declarant acted in conformity with his intention or design, uncertain or equivocal statements or statements of mere desire may not be admissible for that purpose.  See, e.g., United States v. Hogan, 886 F.2d 1497, 1511-1512 (7th Cir. 1989)(citing Hillmon, 145 U.S. at 295, 12 S. Ct. at 912).  In excluding Groseclose's out-of-court statements, the trial court seemingly adopted this limitation.  We note that, even if statements of intent or design need not be so concrete under Tenn. R. Evid. 803(3) in order to prove action in conformity therewith, certainty and specificity undeniably enhance the probative value of the statements.  2 Kenneth S. Broun et al., McCormick on Evidence § 275, at 223 (John W. Strong ed.,1999).  Nevertheless, Groseclose was not introducing his statements for the purpose of proving that he in fact moved to Kingsport with his family or that he in fact searched for a job in Kingsport but instead for the purpose of proving his conciliatory feelings toward his wife at a time when he was purportedly moving, inciting, counseling, hiring, commanding, or procuring Rickman and Britt to murder his wife, Tenn. Code Ann. § 39-107, and contemplating living with Mount in Memphis thereafter.  Cf. United States v. Hartmann, 958 F.2d 774, 783 (7th Cir. 1992)("[W]e previously have recognized that hearsay is admissible under 803(3) in order to establish a deceased declarant's state of mind that is inconsistent with the declarant voluntarily taking certain action . . . .").

In short, we conclude that Groseclose's statements concerning his desire to move with his family to Kingsport and find a job in that city were statements of his then existing state of mind within the meaning of Tenn. R. Evid. 803(3) and, to the extent they circumstantially established his conciliatory feelings toward his wife, were relevant to the issue of whether he was then planning her murder.  Groseclose's statement concerning the crime rate in Memphis, however, was a statement of belief and, therefore, inadmissible.  Cf., e.g., United States v. Fontenot, 14 F.3d 1364, 1371 (9th Cir. 1994)("'The state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind.").  In any event, we agree with the State that any error by the trial court was harmless.[19]  In particular, we note that the appellant's statements were self-serving and entirely consistent with Britt's testimony that the conspirators planned Deborah's murder so as to divert suspicion away from Groseclose.

### D.  Sufficiency of the Evidence

Finally, Groseclose challenges the sufficiency of the evidence underlying his conviction of being an accessory before the fact to first degree murder.  The State disagrees, arguing that it overwhelmingly established the appellant's guilt.  In order to successfully challenge the sufficiency of the evidence supporting his conviction, the appellant must demonstrate to this court that no "rational trier of fact" could have found the essential elements of his offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v.

---

[19]The appellant does not rest this complaint upon constitutional grounds.  Cf. State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000).  Regardless, we note that the result of our harmless error analysis is the same under Tenn. R. App. P. 36(b) and Tenn. R. Crim. P. 52(a) and under Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967).

Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Tenn. R. App. P. 13(e). In other words, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The above standards of review apply to convictions based upon direct evidence, circumstantial evidence, or both. State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000), cert denied, 533 U.S. 953, 121 S. Ct. 2600 (2001). In the trial court, however, when the State relies wholly upon circumstantial evidence to secure a defendant's conviction, it must establish that the evidence is "inconsistent with his innocence, and that it excludes every other reasonable theory or hypothesis except that of guilt." State v. Gilliland, 22 S.W.3d 266, 275 (Tenn. 2000). Contrary to Groseclose's assertion in his brief, the State's proof in this case was both direct and circumstantial. Cf. State v. Coulter, 67 S.W.3d 3, 68-69 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 2001). Even so, implicit in our discussion of the harmless effect of Mount's former testimony is our conclusion that the remaining evidence overwhelmingly and unerringly pointed the finger of guilt to the appellant "'to the exclusion of all others beyond a reasonable doubt.'" Gilliland, 22 S.W.3d at 275. The appellant is not entitled to relief.

## IV. Conclusion

Having thoroughly reviewed the record in this case, we note that, while the trial court recorded on the appellants' judgments of conviction their receipt of credit for time served in the Shelby County Jail prior to trial, the court neglected to record the appellants' receipt of credit for time served in the Tennessee Department of Correction. Tenn. Code Ann. § 40-23-101(c) (1997); see also Marsh v. Henderson, 424 S.W.2d 193, 195 (Tenn. 1968); Stubbs v. State, 393 S.W.2d 150, 154 (Tenn. 1965). Accordingly, we remand this case to the trial court for correction of the judgments to reflect the requisite credit. We affirm the judgments in all other respects.

_____
NORMA McGEE OGLE, JUDGE